## MINNIE JONES, PROSECUTRIX, v. NEWARK TERMINAL & TRANSPORTATION COMPANY, DEFENDANT.

Submitted October 7, 1941—Decided February 25, 1942.

Before BROGAN, CHIEF JUSTICE, and Justices CASE and HEHER.

For the prosecutrix, *George A. Henderson* (*Charles E. McCraith, Jr.,* of counsel).

For the defendant, *Clarence B. Tippett.*

The opinion of the court was delivered by

HEHER, J. The question at issue is whether the death of prosecutrix' husband is reasonably attributable to an accident which arose out of and in the course of his employment with the defendant corporation, and therefore compensable under *R. S.* 1937, 34:15-7, *et seq.* The Deputy Commissioner found that the *onus probandi* had been sustained, but the Essex Court of Common Pleas ruled otherwise and dismissed the petition. We concur in the latter view.

Concededly, the deceased employee met with an accident on October 30th, 1936, in the pursuit of his employment as a stevedore. While pulling a handtruck up a gangplank

leading from a moored boat to defendant's freight house, his head struck a beam extending across the top of the building entrance, and he thereby suffered a laceration of the scalp in the occipital region. He was immediately taken to a hospital for treatment. The wound was cleansed and sutured, and he returned to his employment within an hour or two and resumed his usual duties. He worked the remainder of the day, and daily thereafter, ten hours per day, until the ensuing November 13th, when he was found prostrate on the deck of a boat whither his labors had called him. Death occurred shortly thereafter. There is no evidence of another industrial mishap on the day of his death. The contention is that the cause of death was a fracture of the base of the skull suffered in the accident adverted to. But it is in this respect that the proofs are deficient.

The widow and a neighbor testified that, from the time of the injury until death occurred, the deceased complained of headaches and manifested what a medico-chirurgical witness, Dr. Haskell, in response to a hypothetical question, characterized as objective symptoms of a "fracture in the anterior fossa of the base of the skull" (and, possibly, a fracture of the inner plate also) and "injury to the right cerebrum of the brain below the capsule, with a hemorrhage," warranting the conclusion that death came from an "epileptic seizure" ensuing from neglect of the fracture by the attending physician, who was in the service of the defendant employer. The manifestations thus testified to were, in brief, "dark streaks of blood" on the victim's handkerchief after the blowing of his nose, "dragging" of his left leg, twitching of the face, insomnia, loss of appetite, listlessness, apparent pain, and oral "foaming" during the fatal attack.

Yet these phenomena were not observed by the attending physician, Dr. Gluckman, who treated the deceased on alternate days until the sutures were removed on the fifth day, nor by any of his fellow employees. The patient was not heard by them to complain of headaches. This physician found no injury to the skull bone: and he "could definitely say there wasn't" an "internal hemorrhage; the man had no complaints referable to the brain, skull, or any of the under-

lying tissues; * * * there was no evidence of any cerebral concussion." He looked for such. He inquired whether the patient had "had any headaches; his eyes and eye grounds were examined; he was given an equilibratory test, knee jerks were equal." There was "a complete recovery."

And Dr. Haskell assumed, in arriving at his opinion, that the deceased had "constantly bled from the nose," which he termed a "positive sign" of a skull fracture, and that he had "had a terrible wallop with a big beam—he hit 'his head against the beam." It was shown that, after the accident, the deceased continued along the' gangplank with the truck; and this the witness explained thus: "He could not drop because he was holding his hands against handle bars and that would prevent him from dropping on the floor, otherwise he would." Yet his subsequent behavior would seem to suggest a much less grievous injury.

But there was definite proof of the cause of death at variance with the deductions of this witness. An autopsy performed by Dr. Berardinelli, an assistant to the medical examiner of the County of Essex, at the direction of his superior, revealed what he considered conclusive evidence that death resulted from a "spontaneous rupture of an aortic aneurysm." An aneurysm is a sac formed by the dilatation of the walls of an artery due to local degeneration or injury of the inner coats of the vessel, and filled with blood—in this instance, a condition specific and not traumatic in origin. A contributory cause of death was hemopericardium, *i. e.*, the filling of the pericardial cavity with blood flowing from the ruptured aneurysm, and the clotting of the blood content. The condition was chronic. It was a "laminated clotting." This aneurysm was of long standing—"for years." Syphilis is the usual but not the sole cause of the condition. This witness' examination of the skull also disclosed a "lineal wound still covered with fresh dried scab—three inches long." It was a "scalp wound, in scalp tissue." There was no indication whatever of a skull fracture or a cerebral hemorrhage. The matters testified to by the widow would not lead him to a different result. "Foaming at the mouth" signified an epileptic seizure to Dr. Haskell; to this witness it meant "terminal

edema of the lungs." Dr. Haskell agreed that it "takes years to form an aneurysm;" but he insisted that the bursting of the aneurysm was not the cause of the deceased's death, terming it a "mere coincidence." It was his view that the rupture was due to "increased pressure in" the aneurysm produced by the fall.

In these circumstances, it is a fair and reasonable presumption that the cause of death was a breaking of the aortic aneurysm, unassociated with the physical consequences of the industrial accident. Such an aneurysm is inoperable and otherwise incurable, and ordinarily terminates life by rupture. There is no basis in the proofs for the inference that there was a traumatic aggravation of the pre-existing diseased condition, and the accident was therefore the causative agent of the breach. Prosecutrix' expert did not venture that opinion.

Even if the evidence were in equipoise, prosecutrix could not prevail. To warrant a recovery, it is essential that the evidence preponderate in favor of the tendered hypothesis. That must be a rational inference, i. e., such as is based upon a preponderance of the probabilities according to the common experience of mankind. It is required to be a probable or more probable hypothesis with reference to the possibility of other hypotheses. This is the accepted standard of persuasion governing the triers of the facts. The law does not proceed to judgment on pure surmise. *Jackson* v. *Delaware, Lackawanna and Western Railroad Co.,* 111 *N. J. L.* 487; *Gilbert* v. *Gilbert Machine Works, Inc.,* 122 *Id.* 533; *Jaeger* v. *Elizabethtown Consolidated Gas Co.,* 124 *Id.* 420; *Auten* v. *Johnson,* 115 *Id.* 71. To hold on the evidence adduced that the industrial accident was the producing cause of death would be the merest conjecture.

The judgment is accordingly affirmed, but without costs.