17 N.J. Super. 164 (1951)
85 A.2d 331
JOSEPH JANUSZEWSKI, PETITIONER-APPELLEE,
v.
PUBLIC SERVICE COORDINATED TRANSPORT, RESPONDENT-APPELLANT.
Superior Court of New Jersey, Essex County Court Law Division.
Decided October 18, 1951.
*166 Mr. Louis C. Jacobson, attorney for petitioner-appellee, Joseph Januszewski.
Mr. Carl T. Freggens (Mr. David M. Sellick appearing), attorney for respondent-appellant, Public Service Coordinated Transport.
NAUGHRIGHT, J.C.C.
This is a workmen's compensation appeal by Public Service Coordinated Transport from a determination of the Deputy Director awarding compensation to petitioner, Joseph Januszewski. The basic issue presented by the appeal is whether the cerebral hemorrhage and resultant disability suffered by petitioner on October 13, 1948, was the result of a compensable accident within the intendment of *167 the Workmen's Compensation Act. R.S. 34:15-1 et seq., N.J.S.A.
The facts are as follows: The petitioner is 46 years of age. On October 13, 1948, the date of the alleged accident, and for five years prior thereto he was employed by the respondent-appellant as a bus driver. During this five-year period he worked regularly, losing time from his job on only two occasions  one because of an attack of flu which kept him out about two weeks and the other because of an eye infection that "troubled" him about a month.
Except for these two instances he had not been troubled by any illness. While he had been rejected for military service because of high blood pressure, he had never been treated for such condition.
On October 13, 1948, petitioner was assigned to operate the No. 60 bus  a Montclair to Newark run. He had had this run for two months. Petitioner worked the rush hour trip at about 7 A.M. of the morning of October 13, 1948, returned home after the trip and reported for work again at his usual time  4:30 P.M. of that same day. He relieved the driver then on duty at Bloomfield Avenue and Elm Street, made his trip to Normal Avenue, Upper Montclair, and then proceeded back on the return trip to Branford Place, Newark.
At the corner of Bloomfield Avenue and Clifton Avenue petitioner stopped to pick up three or four passengers. After the passengers had boarded the bus he started to pull away from the curb and across the intersection, as the light was green for traffic on Bloomfield Avenue. It was a busy hour and the area was well travelled. Just as he started up, he said that a little black closed paneled truck came from his left (it was either a Ford or Chevrolet) and shot straight across the intersection in front of his bus at about 40 miles per hour. The truck, coming out of Clifton Avenue, was proceeding against a red light, i.e., for traffic on Clifton Avenue.
Petitioner stated that he applied his brakes in an effort to slow up and stop. The incident occurred with such suddenness *168 that petitioner thought there would be a collision. He described his reaction to the "near accident" in the following language:
"As the truck shot in front of me, I shook my head because the first thing I did was I felt like I had a hot flush run right through me and right around me here (indicating the chest and region of the heart). Well, I started to sweat a little bit and I tried to shake this feeling off."
Petitioner, although flustered and nervous and sweating profusely, kept on going in the hope that this feeling would wear off. He stopped his bus at the next corner  Bloomfield Avenue and Mt. Prospect Avenue  to pick up some passengers, began to feel faint and dizzy and noticed that he was unable to transfer coins from his right to his left hand.
He continued to drive his bus until he reached the corner of Bloomfield Avenue and Park Avenue about two or three blocks from Mt. Prospect Avenue. There he saw a Mr. Murphy, an inspector for the Public Service, to whom he called for assistance. He told Mr. Murphy he was ill. Mr. Murphy then carried him from the bus with the help of three or four other persons and sat him on the steps of a store on Bloomfield Avenue. Petitioner could hear people's voices but could not see them. He wasn't able to move his body normally. The last thing petitioner remembered was that he was put on a stretcher and removed to St. Michael's Hospital.
The testimony of Mr. Murphy, called by respondent-appellant as a witness, seems to bear out the testimony of petitioner as to the series of events that occurred at the corner of Park and Bloomfield Avenues.
Mr. Murphy testified that he saw this No. 60 bus creep through the light at a very slow speed. It had crossed out of its lane into the wrong lane and would have struck nearby cars had it not been for Mr. Murphy's quick action in jumping into the bus and bringing it to a halt. Petitioner was half sprawled across the wheel of the bus when Mr. Murphy entered. He was slumped helplessly over the wheel, could not *169 speak and was moaning. Mr. Murphy managed to guide the bus away from the parked cars.
A Mr. Paul Benson, called by respondent, testified that he observed the bus which petitioner was driving as he was parked for a red light on the corner of Park Avenue and Bloomfield Avenue. He saw the bus coming from the opposite direction toward him. The bus, proceeding against a red light, crossed out of its lane and was heading toward Mr. Benson's car when it suddenly came to a stop about four or five feet in front of his car. At that point someone got into the bus, Mr. Benson said, and in the attempt to move the bus his car was struck.
Mr. Benson observed that petitioner was in a helpless condition and that his left side appeared limp. It was about five or ten minutes past five when all this happened.
Petitioner remained in the hospital where he was attended to by Dr. Antonious until December 23, 1948. After his discharge from the hospital he returned to the clinic at the hospital about 31 times for treatment. He was also under the care of a physiotherapist who administered treatments to him at petitioner's home for about two months, coming about three times a week. Petitioner also continued to visit Dr. Antonious for medical attention about every three or four months.
All medical bills were paid by petitioner or his sister with one exception. Part of the hospital bill was paid by the New Jersey Hospital Plan. Except for sick benefits totalling $540 petitioner had not received compensation from respondent-appellant.
Petitioner has been unable to do any work and the entire left side of his body is paralyzed. He can only walk with the aid of a cane.
The record of St. Michael's Hospital was marked in evidence with the consent of respondent-appellant. It indicates that petitioner was admitted on October 13, 1948, and discharged on December 23, 1948. It further indicates that petitioner was unable to move his extremities and showed a *170 typical left hemiplegia with slurring and indistinct speech. The diagnosis was cerebral hemorrhage and hypertensive heart disease.
Petitioner introduced certain medical testimony on the issue of causal relationship between his present condition and the alleged "accident" or "near accident."
Dr. Bernstein, a specialist in internal medicine and cardiovascular diseases, was called on behalf of petitioner. He said that he made an intensive and thorough examination of petitioner and it was his opinion that petitioner had a hypertensive arteriosclerotic cardiovascular renal disease with the residual of a left hemiplegic.
In response to a hypothetical question as to whether there was a direct causal relationship between the alleged "near accident" on October 13, 1948, and the present condition of petitioner, Dr. Bernstein testified that "there is a direct causal relationship between his present hemiplegia on the left side and the incident which occurred on October 13, 1948."
The doctor stated that his reasons for his opinion were that he felt that the petitioner had a pre-existing hypertensive cardiovascular disease and that when he was cut off by the truck experienced a sudden fright: 
"an emotional experience * * * that resulted in the symptomatology which started by the manifestation of marked rise in blood pressure at the time at that point enough to produce some tearing of a blood vessel on the right side of the head, particularly in the region of the internal capsule, * * * resulting in enough seepage of blood to finally produce the left hemiplegia which then resulted in the evidence we now see."
Dr. Bernstein said that the disability is 100% of total irrespective of any other condition that might have preexisted.
Dr. Riggs, a specialist in neurology and psychiatry, called by petitioner, testified that he examined petitioner on March 11, 1951, and that his diagnosis was an encephalopathy with *171 a left hemiplegia due to the cerebral hemorrhage. Dr. Riggs stated that he felt that the emotional excitement of a near accident resulted in the cerebral hemorrhage and in the cerebral encephalopathy and left hemi-paresis.
He further testified that an emotional excitement of a near accident will cause an increase in the blood pressure which would result in the rupture of one of the arteries of the brain. Dr. Riggs testified that the petitioner is disabled 100% of total ascribable to the occurrence of October 13, 1948, irrespective of any pre-existing condition that petitioner may have been suffering from prior to that date.
If the accident had not occurred Dr. Riggs said he would attribute the disability to a ruptured cerebral artery due to other causes, viz., hypertension and vascular disease.
It is the petitioner's contention that the cerebral hemorrhage he sustained with the consequent paralysis of his entire left side was induced by the shock and fright of a "near accident" at the corner of Bloomfield Avenue and Clifton Avenue on October 13, 1948. His case, in substance, rests upon his own testimony as to the occurrence of a "near accident," and the medical testimony of two specialists as to the causal relationship between the "near accident" and petitioner's disability, based upon the assumed fact that a near accident did occur.
Respondent-appellant, in an effort to controvert petitioner's claim of a "near accident," called as one of its witnesses a Mrs. Ruth Freeman, a passenger on the bus on October 13, 1948. Mrs. Freeman testified that she did not notice anything unusual about the operation of the bus or the actions of the bus driver at or about Bloomfield Avenue and Clifton Avenue. She said she could not recall the driver making a quick stop at Clifton Avenue.
Mrs. Alice Drake, another passenger on the bus at the time of the alleged "accident" or "near accident," said she could not recall anything unusual about the operation of the bus or the actions of the driver near Clifton Avenue. She admitted, however, that she was not paying any particular *172 attention to the operation of the bus or the traffic, and that if a car or truck came out of Clifton Avenue she may not have seen it.
It may be noted in passing that the testimony of these two passengers on the bus was not to the effect that the accident did not occur.
A Mr. Fred Reed, employed by the respondent-appellant as assistant chairman of its Welfare Department and called as its witness, testified that petitioner was paid $540 as a result of his application for sick benefits. The application was accompanied by the certificate of Dr. Antonious who had treated petitioner in the hospital, in support of the claim for sick benefits.
Mr. Reed, who was present at an informal hearing in the case held before Referee Burke on September 5, 1950, at which time petitioner was also present, said that petitioner was asked by the referee if he had had an accident and he replied that he had had no accident; that he was simply driving when he blacked out. The referee interrogated him further to find out if there was an accident at some previous occasion on this date and he said he could not recall anything.
At this point Referee Burke's notes of the conversation were placed in evidence. The following is stated in the referee's notes on this hearing: "No history of accident. Stated he was just driving along in his bus when hemorrhage occurred."
On cross-examination petitioner had admitted being before the referee but denied the referee asked what happened to him. He said that he was asked what he was there for and that he told the referee his reason for being there. He did not seem able to recall telling the referee that he had no accident but was just driving along when the hemorrhage occurred.
Another of respondent-appellant's witnesses, a Mr. Joseph Lawrence, an employee in their Welfare Department, had occasion to call on petitioner in August and November of 1949 in connection with petitioner's application for group *173 insurance. He stated that petitioner never mentioned an accident to him but merely said he was sick.
Dr. Thomas Pascall, a witness for respondent-appellant and a specialist in industrial medicine and surgery, visited petitioner at his home on February 6, 1949, in response to a request by the Welfare Department to examine petitioner. The doctor said that petitioner gave him a history in the presence of his (petitioner's) sister that on October 13, 1948, "he was operating a bus without any unusual strain, untoward incident or accident" when he suddenly became dizzy with inability to move his left hand. He never mentioned, he said, any episode of a "cut-off" at Bloomfield Avenue and Clifton Avenue. On cross-examination Dr. Pascall was asked whether petitioner used the phrase "no unusual strain or untoward incident" and he replied, "In sense, yes."
Dr. Pascall again visited petitioner on January 7, 1950, at which time he asserts petitioner made no mention of a "near accident" or "cut-off." The doctor had examined petitioner and reported that he was totally and permanently disabled.
Dr. Asher Yaguda, a specialist in internal medicine, was called by respondent-appellant to give testimony as to the causal relationship, if any, between petitioner's disability and the alleged "near accident" of October 13, 1948. Dr. Yaguda had examined petitioner on April 10, 1951, at which time petitioner had given him a history of a "near accident" at Clifton and Bloomfield Avenues. The doctor reported that it was his opinion that there was no causal relationship because it was his finding that the petitioner was suffering from an essentially hypertension with arteriosclerotic heart disease superimposed and that the natural progression of such condition is such that between 25 and 30 to 35% of these people die as the result of a stroke.
The doctor maintained that his disability was part and parcel of the natural progression of the condition from which he is suffering and that petitioner's history is "characteristic of what happens in these cases." Dr. Yaguda conceded, *174 however, that any emotional factor such as fright would tend to elevate the blood pressure and might cause a rupture of one of the cerebral vessels, although he contended that a cerebral hemorrhage could occur as the result of any psychological event.
Respondent-appellant places great stress on certain statements in the medical report of St. Michael's Hospital as negativing the happening of a "near accident." In response to the question in the report as to how and where the accident occurred the report states "while driving bus patient collapsed at wheel and hit another car at Bloomfield and Park Avenue."
It should perhaps be noted at this point that that statement is of little or no probative value for it is not shown that petitioner himself made that statement. The medical report itself shows that petitioner was in an almost unconscious condition at the time he was removed to the hospital and for quite some time thereafter, and that his speech was "slurry and indistinct." Just how, in such condition, the petitioner could have furnished this data is difficult to comprehend. Petitioner himself denies making any such statement to any of the doctors at the hospital. It is an inescapable conclusion that the statement in the report is pure hearsay.
There is some intimation by respondent-appellant that even assuming this incident or episode did occur as petitioner alleges, nevertheless it was not an unusual strain or exertion but in fact a daily occurrence in the life of a bus driver. For such reason respondent-appellant contends that it cannot be classified as a compensable accident.
In answer to this contention it should be observed that the doctrine of unusual strain or exertion that obtains in heart disease cases is inapplicable to a case involving a cerebral hemorrhage. The doctrine of unusual strain has not been extended beyond the heart disease cases. Fox v. City of Plainfield, 10 N.J. Super. 464, 465, 469 (App. Div. 1950).
A cerebral hemorrhage that results from a rise in blood pressure generated by the excitement, nervous strain or shock of a risk incident to the employment is as much an "accident" *175 within the legislative purview as a cerebral hemorrhage resulting from a crushed or cut blood vessel by reason of physical force or impact. Fox v. City of Plainfield, supra.
We have established as a recognized principle the fact that an award may be made where the workman dies of heart failure as the result of emotional shock, without any outward physical trauma, where the incident giving rise to the shock or stress arose from a risk connected with the employment. Geltman v. Reliable Linen & Supply Co., 128 N.J.L. 443 (E. & A. 1942). In the Geltman case petitioner, a chauffeur, became involved with another truck driver in a heated colloquy during which there was an exchange of angry and abusive language. Petitioner, although not physically assaulted or otherwise injured, slumped over and died instantly. The autopsy disclosed a condition of arterial sclerosis. The award entered by the bureau was reversed however, by the former Supreme Court. The case then went to the Court of Errors and Appeals and the court, in reversing the Supreme Court and affirming the bureau, said at page 446:
"In the case at hand, the cause of death was * * * due to emotional and nervous shock attending the assault; and this is no less a `personal injury by accident' than if it had ensued from physical impact."
Assuming, here, that petitioner experienced a "near accident" at the corner of Bloomfield Avenue and Clifton Avenue, it was a risk incidental to and growing out of his employment as a bus driver. The risks of possible collisions and cut-offs are hazards connected with and inherent in the life of every bus driver. Such "near accident" giving rise to an over-powering fright and consequent hemorrhage is an accident within the intendment of the act, since it is an unlooked for mishap  an untoward event not expected or designed. Bryant v. Fissell, 84 N.J.L. 72 (Sup. Ct. 1913).
The basic question now remaining for disposition is whether the petitioner's story of a "near accident" at the corner of Bloomfield Avenue and Clifton Avenue on October 13, 1948, in point of fact, actually took place.
*176 It is, of course, a fundamental proposition of law that petitioner bears the burden of proving his claim by a preponderance of the evidence. Gilbert v. Gilbert Machine Works, Inc., 122 N.J.L. 533 (Sup. Ct. 1939); Jones v. Newark Terminal and Transp. Co., 128 N.J.L. 190 (Sup. Ct. 1942). In connection with this principle it should be kept in mind that the evidence in this case as to the happening of a "near accident" rests almost exclusively upon the credibility of the witnesses.
Petitioner's testimony as to the incident or episode at Clifton Avenue is not directly contradicted by any of the witnesses called by respondent-appellant. The testimony of the two passengers on the bus at the time the incident is supposed to have occurred is negative in character, inasmuch as neither claims nor contends that the accident did not occur, not having observed the traffic or the operation of the bus driver at the time.
The event having transpired with apparent suddenness it is quite probable that it could have gone unnoticed by the passengers within the bus unless their attention was directed to the road at that precise moment. In any event the occurrence of a "near accident" is not rendered inherently improbable by the testimony of these two witnesses.
It should be pointed out with particular emphasis that the word "accident" in its popular sense and as ordinarily understood by a layman, imports the idea of physical impact or collision. It would not, therefore, occur to the average layman that a "near accident" would be or could be an "accident" in the legal sense, since he would be familiar only with the popular connotation of the word.
The failure then of petitioner to tell Mr. Lawrence, a representative from the Welfare Department of respondent-appellant, who visited petitioner in August and November of 1949 in connection with petitioner's application for group insurance, that he had met with an "accident" on October 13, 1948, is readily understandable. Petitioner undoubtedly felt that no physical impact or collision having taken place, he had *177 not met with an "accident." This would explain why petitioner made application for sick benefits and did not claim, until he filed his petition almost two years after the episode, that he suffered an injury as the result of an accident.
The testimony of Mr. Fred Reed, an employee of the respondent-appellant, that petitioner at the informal hearing before the referee replied in response to a query by the referee as to whether he had had an accident, that he had met with no accident but just blacked out while driving, is subject to the same infirmity. The petitioner probably placed little significance on the "near accident" at Clifton Avenue and Bloomfield Avenue because he must have felt that not having been involved in any collision he had not met with an accident. The referee's notes do not indicate the extent of the inquiry into the background of petitioner's case and it may well be that little attempt was made to investigate the circumstances surrounding the event or petitioner's understanding as to what an accident in the legal sense is.
Dr. Pascall's testimony that petitioner told him he was "operating the bus without any unusual strain, untoward incident or accident" is of rather doubtful quality, for it is hard to conceive that a person unschooled in the law would have used such words that have especial importance in the law.
The respondent-appellant's attack on petitioner's story of a "near accident" is based largely on innuendo. The testimony as to the occurrence of a "near accident" rests upon the veracity of petitioner himself. In this regard attention should be directed to the findings of the deputy director who had the opportunity to observe the demeanor of the witnesses and to weigh and judge the credibility of their testimony.
The Deputy Director found specifically that "the respondent did not offer any evidence to attack the vital and material phases of petitioner's story, relative to the occurrence of a `near accident.'" He stated in his findings that he was impressed with the straightforwardness of petitioner's testimony and that he found nothing before him to show that *178 petitioner's testimony was unworthy of belief. To such findings considerable weight should be given, for the Deputy Director had the distinct advantage of observing the demeanor of the witnesses. Gilbert v. Gilbert Machine Works, Inc., 122 N.J.L. 533 (Sup. Ct. 1939).
There is a natural hesitation on the part of this court, confined as it is to the written words of the record, to disturb the factual conclusions of the judicial officer to whom the evidence has been orally presented, particularly where the demeanor of the witnesses is of such major importance in determining the weight and probative value to be given to the testimony of each witness. Gilbert v. Gilbert Machine Works, Inc., supra; Folsom v. Magna Manufacturing Co., 14 N.J. Super. 363 (App. Div. 1951).
It is therefore the finding of this court that petitioner has carried the burden of proving he met with an accident arising out of and in the course of the employment.
On the question of causal relationship it is the finding of this court that the medical testimony preponderates in favor of petitioner. The medical specialists on both sides admitted petitioner was totally and permanently disabled as a result of a cerebral hemorrhage. While Dr. Yaguda, testifying for respondent-appellant, maintained that there was no causal relationship between the injury complained of and the "near accident" of October 13, 1948, because petitioner's disability was part and parcel of the natural progression of disease, i.e., hypertension and cardiovascular disease, he did admit that any emotional factor such as fright would tend to elevate the blood pressure and might cause a rupture of one of the cerebral vessels.
The disability of petitioner is 100% of total. This finding is not affected by the fact that petitioner may have been suffering from a pre-existing diseased condition of the blood vessels. Fox v. City of Plainfield, supra.
The assertion by respondent-appellant that it had no notice or knowledge of the injury is totally without merit. Petitioner's sister testified that she went to respondent-appellant's *179 office some seven weeks after the episode to see who would pay the bills and that she was told that her brother's case was not compensable. Dr. Pascall was thereafter sent by respondent-appellant to examine petitioner. In view of such uncontradicted testimony respondent-appellant can hardly be heard to say it had no notice or knowledge of an injury.
Objection was made by respondent-appellant to the introduction into evidence of certain medical bills of petitioner on the ground that they were not authorized and the amounts thereof not reasonable. No real attempt was made to argue these points on this appeal. However, in spite of such failure an examination reveals and warrants the finding that the medical expenses incurred were necessary and reasonable, and respondent-appellant, having refused or neglected to furnish medical treatment, became responsible for the reasonable medical and hospital bills. Donofrio v. Haag Bros., Inc., 10 N.J. Super. 258 (App. Div. 1950).
The judgment of the Deputy Director will be affirmed and the appeal dismissed.