T. SHRIVER & COMPANY, PROSECUTOR, v. COURT OF COMMON PLEAS IN AND FOR THE COUNTY OF ESSEX, RUSSELL C. GATES, CLERK OF SAID COURT OF COMMON PLEAS, AND EDWARD JOURNEY, RESPONDENTS.

Argued October 1, 1940—Decided December 31, 1940.

Before BROGAN, CHIEF JUSTICE, and Justices PARKER and PERSKIE.

For the prosecutor, *James J. Carroll.*

For the respondent, *John A. Laird.*

The opinion of the court was delivered by

PERSKIE, J.   The issues in this workmen's compensation case are sharply drawn.   On the one hand, the employe claims that as the result of an accident, which concededly arose out of and in the course of his employment, he suffers a permanent ailment of his left kidney.   On the other hand, for the employer, it is claimed that the employe has failed to prove his claim; that he was discharged on October 7th, 1935, as cured of his injuries which he allegedly sustained on July 11th, 1935 (the date of the accident) and that he is, in fact, suffering from Bright's disease which is entirely disassociated from the accident.

The facts which give rise to the stated issues are substantially as follows: Edward Journey, a metal worker about fifty years of age, was, on July 11th, 1935, in prosecutor's employ. He was engaged in repairing machines when a piece of metal weighing between 100 and 150 pounds slipped and struck him on his left side. Fellow workmen immediately took him to prosecutor's first aid room and then to the insurance emergency hospital where the insurance doctors examined him. About a half hour later, he was taken to the Orange Memorial Hospital and placed under the care of Dr. Briggs, who was also employed by the prosecutor's insurance carrier.

Dr. Briggs testified that there was a tenderness in the area of the left kidney and a rigidity on the left side of petitioner's abdomen. Blood was present in his urine and there was no doubt in the doctor's mind that the petitioner suffered damage to his kidney. Dr. Briggs called in Dr. Burpeau to examine and take care of petitioner while he (Dr. Briggs) was on vacation.

Petitioner was released from the hospital eleven days after his admission. Dr. Briggs subsequently returned home, treated petitioner until October 5th, 1935, and advised him to go back to work on October 7th, 1935. Although Dr. Briggs stated that he did not know what caused petitioner's pain, he discharged him because he "felt he had no permanent disability."

Petitioner returned to work for prosecutor. After about a week he found he was unable to do the heavy work which the particular job required and accordingly sought and obtained employment of a lighter type of work and at a slightly higher wage than that which he had been receiving from prosecutor.

Petitioner received compensation for temporary disability from July 11th, 1935, to October 6th, 1935, at a rate of $17.33 a week.

After petitioner returned to work he sought medical treatment from time to time. Although the testimony is in dispute as to whether or not he sought or received medical attention between October of 1935 and May of 1937, the pain on his left side continued.

On July 9th, 1937, petitioner filed a claim for compensa-

tion. This was dismissed and judgment was entered against petitioner on February 16th, 1940. The deputy commissioner relied strongly upon the testimony of one Dr. Ill and upon the petitioner's failure to have sought medical treatment between October of 1935 and May of 1937.

On June 20th, 1940, the Court of Common Pleas of Essex county (opinion by Judge Hartshorne) reversed the bureau and made an award in favor of petitioner. Judgment was entered for compensation for permanent disability, costs and counsel fees.

Prosecutor obtained a rule to show cause why a writ of *certiorari* should not issue and a stipulation (at the direction of the justice who allowed the writ) was entered between the parties to argue the rule as though a writ of *certiorari* had in fact been granted.

We thus approach our consideration of the proofs to the end of determining whether they show that the employment was one of the contributing causes without which the accident could not have happened and that the accident was one of the contributing causes without which the injury would not have resulted. *Cf. Ciocca* v. *National Sugar Refining Company of New Jersey,* 124 *N. J. L.* 329, 334; 12 *Atl. Rep.* (*2d*) 130.

In support of that determination we are obliged briefly to analyze the proofs which are practically, if not entirely, medical in nature.

First, we take up those submitted for the employe. Dr. Burpeau, a specialist in urology, treated the petitioner for ten days in the hospital, and saw him on two occasions shortly after his discharge therefrom. The doctor diagnosed the condition as "hemorrhage of the left kidney." In October of 1939, Dr. Burpeau made a cystoscopic examination, which is the only known method of differentiating the condition of one kidney from that of the other. From this, he concluded that although the right kidney functioned normally, the left kidney was abnormal. In addition, the left kidney indicated pus while the right kidney was normal. Dr. Burpeau estimated the disability from thirty-five per cent. to forty per cent. He said that at the time of the trial petitioner suffered from a chronic pyelonephritis, that the condition was a permanent

one, and that surgery would probably be necessary in the future. This condition, he testified, was "* * * the result of his pathology sustained in 1935 at the time he had his injury."

Dr. Levine, another specialist in urology, first saw the petitioner in May of 1937. After giving the same type of cystoscopic examination as Dr. Burpeau, Dr. Levine also concluded that the right kidney was normal and that the left kidney had undergone a destructive process. He testified that there was a kink in the left ureter. He prescribed a belt which the petitioner has worn ever since and he saw the petitioner thereafter almost thirty times over a period of two and one-half years. As late as September 27th, 1939, he found blood, microscopically, in his urine. Dr. Levine testified that petitioner was justified in his complaints of constant pain. He stated that the left kidney was "very poor;" would require constant treatment, and would probably have to be removed to prevent infection of the other kidney followed by death. Permanent disability, he estimated, to be thirty-five per cent. or forty per cent. of total.

Dr. Henry Davidson, a specialist in neurology and psychiatry, examined petitioner on several occasions. He found that he suffered from a neurotic condition which "* * * is due to and has grown out of that accident and the *sequelli* of the accident." He estimated "* * * that the neurosis is producing a disability of ten per cent. to fifteen per cent. of total."

Secondly, we take up the medical proofs offered for prosecutor. Dr. Ill specialized in surgery and urology. He examined petitioner in September of 1936. He examined the bladder and obtained urine from each kidney pelvis and from the bladder and examined each separately. He also made a pyelogram of the left side. As a result of his tests, Dr. Ill testified that the left kidney was normal. He stated that there was no kink in the left ureter and suggested that the pyelogram which showed a "mottled appearance" of the left kidney was the result of leakage in the sodium iodide injected therein. Both Dr. Burpeau and Dr. Levine testified that leakage, if it were present, would be indicated by different

characteristics than those visible on the pyelogram in question. Dr. Ill saw petitioner only during the time of this one examination.

Dr. Lowy, a specialist in pathology and diagnosis, examined the petitioner once on July 26th, 1937, and once on August 7th, 1939. The first examination, he testified, revealed only that if there was any injury to the kidney, it had healed. After the second examination, he concluded "that this man is suffering from a constitutional disease which was not present or not detected by me on the first examination in 1937, but evidenced itself on my second examination in 1939. * * * the man is suffering from a medical disease (Bright's disease) which has no connection with the trauma, as described in this case." Dr. Lowy pointed out that although a kidney injury may set up infection, he diagnosed petitioner's condition as a chronic one, not an infectious one, and insisted that it was not set up by the injury. He did not test each kidney separately.

Dr. Lewis Loeser, a specialist in nervous and mental diseases, examined petitioner only once. He concluded that "* * * there was no evidence of disability arising from the central nervous system."

Thus, as already observed, we see that Drs. Burpeau and Levine both examined and treated petitioner throughout an extended period. Their examinations were detailed and directed towards separation of the functions of each kidney. Both were urologists specializing in the type of work required in this particular situation and their testimony remains unimpeached. Dr. Ill, on the other hand, made only one examination and one pyelogram of petitioner. His explanation of the pyelogram indicating a "mottled appearance" of the left kidney was refuted by Dr. Burpeau and Dr. Levine. Dr. Lowy saw petitioner only twice and did not cystoscope him nor test each kidney separately. Although he distinguished an infectious disease from a constitutional one, on cross-examination he admitted that he did not mean that a constitutional disease could not come from an injury.

In fine, we hold that the proofs do establish that petitioner suffers from a permanent ailment of the left kidney and that

such ailment is the result of an accident which petitioner suffered on July 11th, 1935, which accident arose out of and in the course of his employment by prosecutor.

Pursuant to the stipulation, let a proper record be framed; and on the record so framed the writ shall be discharged, with costs.