23 N.J. Super. 325 (1952)
93 A.2d 23
BENNETT K. CONQUY, PETITIONER-RESPONDENT,
v.
NEW JERSEY POWER & LIGHT COMPANY, RESPONDENT-APPELLANT.
Superior Court of New Jersey, Appellate Division.
Argued November 3, 1952.
Decided December 1, 1952.
*326 Before Judges EASTWOOD, GOLDMANN and FRANCIS.
Mr. Harry Lane, Jr., argued the cause for appellant.
Mr. Lewis P. Dolan argued the cause for respondent (Messrs. Dolan and Dolan, attorneys; Mr. Robert J. Ford on the brief).
The opinion of the court was delivered by GOLDMANN, J.A.D.
The Workmen's Compensation Bureau awarded petitioner partial permanent disability of 5% of total for a back injury allegedly caused by an accident arising out of and in the course of his employment with respondent *327 on November 30, 1949. The Sussex County Court sustained the award on appeal. Respondent now appeals from the judgment of affirmance.
The record is complicated by the fact that two claim petitions filed by Conquy, respectively involving accidents alleged to have occurred on November 30, 1949 and April 17, 1950, were by stipulation tried together. Respondent company's motion to dismiss the second claim petition was granted by the deputy director at the conclusion of the hearing in the Bureau, and no appeal has been taken therefrom.
Conquy had been in respondent's employ as a meter reader for some eight years. He testified that on the morning of November 30, 1949 he stopped his truck in front of a house where he was to read a meter, opened the door to get out, and just as he put his foot on the ground experienced a severe pain in his back, described as the right lumbo-sacral area. He felt better after a few minutes, went on to read the meter, and then read two others before the pain became so severe that he had to return to the Newton office. The branch manager drove him to a local physician who strapped up his back. Conquy had never had back trouble before this incident.
The next day petitioner went to Dr. Boston, an osteopathic physician. The diagnosis was low lumbar sprain and a slight sacroiliac condition. He treated petitioner on December 1, 2, 3 and 5 and recommended a sacroiliac belt which Conquy purchased. Dr. Boston next saw him on January 9, 1950 when he came in for a checkup, and at that time petitioner said he "was feeling all right" and "needed no more treatment." Examination revealed that the patient "had no pain and no trouble." Petitioner again saw Dr. Boston for a checkup on June 2, 1950 and told him he was all right and had been working. The doctor gave him a thorough examination and found everything normal.
On January 31, 1950, petitioner had visited a Dr. Spurgeon to be examined relative to bilateral inguinal hernias of long standing. At that time he told the doctor his back felt *328 all right. Dr. Spurgeon operated to repair the hernia condition on March 2, 1950, gave post-operative treatments until April 3, 1950, and released petitioner to return to work on April 17, 1950. He next saw Conquy on June 16, 1950 and at that time he complained of a pain he had had for the past month in his right hip, running down the thigh and back of the leg. The pain followed the right sciatic nerve and there was a tenderness in the right groin. Conquy gave the doctor a history of a fall suffered on April 17, 1950 when he fell down the back stairs of a house where he had gone to read a meter. In the course of the fall his back hit against the corner of a garage; he landed on his right side and his right ankle pained severely.
Dr. Spurgeon diagnosed Conquy's condition as sciatica and treated him for it from June through September with diathermy and leg injections. Toward the end of this period he learned from petitioner that on September 7, 1950 he got a sudden pain in the mid-region of his back while reaching into his car for a package. He X-rayed Conquy immediately and found the sacral and sacroiliac joints normal, just as he had when X-rays were taken two months before; and the intervertebral discs, as far as he could judge, showed no changes.
Dr. Spurgeon did not see petitioner again until April 13, 1951, when he came to see him about a pain in the right inguinal area. He also complained of a pain in his back. The doctor operated on April 25, 1951 and found a weakness of the inguinal ring and a large fat lobule.
On November 13, 1950 Dr. Massengill, a specialist in orthopedic surgery, examined petitioner at the request of respondent's attorney. Conquy told him of the November 30, 1949 incident and that his lower back was all right after a few treatments by Dr. Boston. He also told him of the April 17, 1950 fall and of Dr. Spurgeon's treatments, but made no mention of the September 7, 1950 incident. Conquy complained of pain in his right leg running from the buttocks to the calf. The doctor found that petitioner had a *329 bilateral lumbar spasm and tenderness, restriction of straight leg elevation and a slight restriction of knee and thigh flexion, and he diagnosed the condition as a lower back injury involving the lumbar muscle.
Conquy was next examined by Dr. McCall, a specialist in internal medicine and cardiology, on December 15, 1950. Dr. McCall found a marked tenderness present over the right sciatic notch; there was a tender mass of acorn size in the upper portion of the right inguinal canal, and straight leg raising was painful on both sides. He re-examined petitioner on October 1, 1951. The lump in the right groin was not apparent, there was improvement in the sciatic pain, the straight leg raising test was still positive, and otherwise there was little change in his physical condition.
So much for the history of petitioner's physical condition and visits to doctors since November 30, 1949. There were incidental visits to three other physicians in this period, but the reasons for these visits or their relevance to the issue was not made clear.
In order to recover, the petitioner in a workmen's compensation case must establish that he suffers a disability and that it is the proximate result of the particular accident on which his claim is based. In the oft-quoted language of Gilbert v. Gilbert Machine Works, Inc., 122 N.J.L. 533, 538 (Sup. Ct. 1939):
"* * * The law places the burden of proof on the peitioner for compensation; and it is not sustained unless the evidence preponderates in favor of the tendered hypothesis. That must be a rational inference, i.e., based upon a preponderance of probabilities according to the common experience of mankind. It is required to be a probable or more probable hypothesis with reference to the possibility of other hypotheses. * * *"
Or, as stated in another way in Russo v. Wright Aeronautical Corp., 1 N.J. 417, 420 (1949):
"We may consider it settled that an award of compensation may not be granted upon a finding that injury `could have been' the result of an accident. `To sustain a recovery the proofs must support the *330 basis for the rational inference that the accident caused the injuries' complained of. Calicchio v. Jersey City Stock Yards Co., 125 N.J.L. 112, 115 (Sup. Ct. 1940); Azarowicz v. Met. Beef Co., 118 Id. 89, 90 (Sup. Ct. 1937). In the final analysis `probability, and not the ultimate degree of certainty is the test.' Auten v. Johnston, 115 N.J.L. 72, 74 (Sup. Ct. 1935); Azarowicz v. Met. Beef Co., supra."
Petitioner has failed to sustain the burden of proof by a fair preponderance of the competent evidence. Medical testimony is always of primary importance in establishing the causal relationship between the alleged accident and the claimed disability. And where, as here, that testimony is in conflict, it is reasonable to give greater weight to the testimony of the treating physician. Fusco v. Cambridge Piece Dyeing Corp., 135 N.J.L. 160 (E. & A. 1947); Cf. Dunn v. Atlantic City, 120 N.J.L. 141 (Sup. Ct. 1938), affirmed 121 N.J.L. 588 (E. & A. 1939); T. Schriver & Co. v. Court of Common Pleas, 125 N.J.L. 585 (Sup. Ct. 1940).
The two treating physicians here were Dr. Boston and Dr. Spurgeon. The latter appeared as a witness for petitioner. It was not until the end of September 1950 that he received any complaint referable to petitioner's back, and was then told of the September 7 incident. Dr. Spurgeon admitted that he did not know whether there was any relation between Conquy's complaints and the alleged accident of November 30, 1949.
Dr. Boston, who testified for respondent company, got no complaint of back pain at any time following the few days' treatment he had given petitioner in early December of 1949. He found his patient in good condition in January and again in June 1950, and Conquy told him he was experiencing no trouble.
It is to be recalled that petitioner's other medical witness, Dr. McCall, is a specialist in internal medicine and cardiology, and had never treated petitioner. He is the only witness who attributed Conquy's condition, apparently a purely orthopedic one, to an incident alleged to have occurred more than a year before his examination. This opinion, given in answer to a hypothetical question, was based on a *331 number of erroneous elements. Among them was the history which petitioner had given him of twisting his back when he stepped from the truck on November 30, 1949. Such history is, of course, not proper evidence of the alleged twisting (Helminsky v. Ford Motor Co., 111 N.J.L. 369 (E. & A. 1933); Freedman v. Essex Chair Co., 135 N.J.L. 512 (E. & A. 1947), and there is no competent evidence in the case to support it. In reaching his conclusion Dr. McCall also considered that petitioner had suffered recurring back pain right along. The doctor's records contained no reference to any such pain, continuous or recurrent, and there is no evidence that petitioner suffered back pain from the beginning of January until after the September 7, 1950 incident, when he was under treatment by Dr. Spurgeon for his sciatic condition. Dr. McCall also based his opinion on petitioner's assertion that he had tried to work on numerous occasions, but could not. The fact is that Conquy lost no time from November 30, 1949 until June 21, 1950 when he left his work because of sciatica  except for the period of the hernia operation and his recovery therefrom  and that he did not return to work until January 1951, after Dr. McCall examined him.
As to the findings of tenderness over the right sciatic notch and restriction of straight leg raising, Dr. McCall readily admitted that the former could cause the latter, and that such tenderness can be present without the intervention of any trauma  sciatic nerve difficulty could occur diopathically.
On cross-examination it soon became apparent that Dr. McCall had adopted a false premise in determining causal relationship. He testified that "causal relationship * * * starts with the premise that the nature of the accident could cause the findings. * * * The accident, alleged accident, put it that way, was one of such nature that could cause the disability." Mere possibility does not suffice to forge the causal link; if that were so, the law would "proceed to judgment on pure surmise." Jones v. Newark Terminal & Transp. Co., 128 N.J.L. 190, 193 (Sup. Ct. 1942). A petitioner *332 must do more than show that his disability could have been the result of the accident. Russo v. Wright Aeronautical Corp. above; Ridgeway v. Real Estate Operating Co., 15 N.J. Misc. 477 (Sup. Ct. 1937), affirmed 121 N.J.L. 585 (E. & A. 1939); Jacques Wolfe & Co. v. Piplin, 14 N.J. Misc. 146 (Sup. Ct. 1936).
Dr. McCall's written report of his examination of petitioner more clearly indicates his basic uncertainty about the case when he described it as "confused." "There has been such a multitude of attending physicians, and a repetition of injuries that it isn't easy to delineate a clear picture."
Dr. Massengill appeared as a witness for the employer. Like Dr. McCall, he also was an examining physician. Based upon the history given him by petitioner, his examination, and the fact picture supplied by the hypothetical question (which included information about the September 7, 1950 incident of which Conquy had not told him), it was his opinion as a specialist in orthopedic surgery that petitioner's condition was attributable to the latter accident. His conclusion was based upon the entire range of facts adduced, particularly Dr. Spurgeon's testimony.
In the light of this medical testimony we are unable to concur in the conclusion of the deputy director that petitioner suffered a permanent injury as a result of the alleged accident of November 30, 1949.
Nor can we agree with the conclusions of the County Court judge on appeal. He fell into error when, in dismissing respondent company's appeal, he held that petitioner's injuries "originated in the accident of November 30, 1949, and were aggravated by the injury of April 17, 1950 and that the injuries complained of do not exceed five (5%) per cent of total permanent disability * * *." The appeal involved only the alleged November 30, 1949 accident. The deputy director had dismissed the claim petition based on the April 17, 1950 incident. No appeal having been taken from the judgment of dismissal, that proceeding was res judicata. There was, therefore, no issue presented to the County Court *333 as to whether there was an accident on April 17, 1950, with resultant disability either by way of aggravation or causation.
On appeal in a workmen's compensation case (R.S. 34:15-66), the County Court must determine only the issues presented, and is limited in its consideration and determination to the grounds of appeal asserted by the parties. Gaeta v. Scott Paper Co., 14 N.J. Super. 261 (App. Div. 1951); cf. Huber v. New England Tree Expert Co., 137 N.J.L. 549 (Sup. Ct. 1948), affirmed 2 N.J. 53 (1949). The confused record resulting from the consolidation of the two claim petitions for trial in the Bureau undoubtedly led the County Court into erroneously stating the issue to be: "Did petitioner suffer an accident on either November 30, 1949 or April 17, 1950 or on both occasions?" In reaching the conclusion it did, the court attributed the 5% partial permanent disability to an accident not within the issues framed  an accident which had theretofore been adjudicated to be non-disabling. That adjudication, as stated, was res judicata upon the County Court.
The judgment of the County Court is reversed and the record is remanded with instructions to enter a judgment consistent herewith.