62 N.J. Super. 365 (1960)
163 A.2d 194
ARTHUR BISONIC, PETITIONER-RESPONDENT,
v.
HALSEY PACKARD, INC., RESPONDENT-APPELLANT.
Superior Court of New Jersey, Appellate Division.
Argued May 3, 1960.
Decided June 28, 1960.
*367 Before Judges PRICE, GAULKIN and SULLIVAN.
Mr. Thomas J. Osborne, Jr., argued the cause for respondent-appellant (Mr. Walter H. Jones, attorney; Mr. Thomas J. Osborne, Jr., of counsel).
Mr. Herman M. Wilson argued the cause for petitioner-appellee.
The opinion of the court was delivered by PRICE, S.J.A.D.
Appellant seeks to reverse a judgment in the County Court affirming an award in favor of petitioner in the Workmen's Compensation Division. The case presents unusual features. The basic issue to be resolved is the propriety of temporary and permanent disability awards, compensating petitioner for a heart condition allegedly caused by the rigors of an operation for multiple herniae on February 15, 1957. Concededly, only one of the herniae, an inguinal hernia, had resulted from an accident on September 9, 1956 arising out of and in the course of petitioner's employment by appellant. Petitioner had earlier refused an offer of appellant at its expense to furnish a surgeon to perform an operation to repair the *368 work-connected hernia. He stated that he was "afraid" of an operation and in any event he would want his own surgeon to do it. In lieu thereof petitioner sought an informal hearing as the result of which hearing, held on January 10, 1957, he was awarded and paid 5% of total permanent disability. However, on February 15, 1957 he underwent the aforesaid multiple herniae operation by a doctor of his own selection. He filed his compensation claim petition June 5, 1957.
It was determined by both of the aforesaid tribunals that the accident and the resultant operative procedure contributed to the aggravation of pre-existing latent coronary disease justifying a disability compensation award therefor of 25% of total. There was no claim by petitioner nor is there any proof in the record that petitioner was left with any permanent disability following the hernia repair other than the aforesaid heart condition. An allowance for temporary disability covering a period of 26 weeks was also made and, in addition, appellant was directed to reimburse petitioner for certain hospital and doctor bills he had paid and to which reference is hereinafter made. Credit, against the permanent disability award, was given appellant for the amount of the previously paid award of 5% of total.
In opposing petitioner's claim, appellant contends that the heart condition resulted solely from arteriosclerotic changes, was unrelated to the operation and therefore non-compensable. The expert medical opinions revealed by the record are so uncommonly contradictory as to emphasize the importance of a detailed analysis of the disputed factual elements against which the opinions are respectively projected.
On September 9, 1956, petitioner, then 62 years of age, while working as a salesman for appellant in its showroom, attempted to push a car on the showroom floor so that it might be displayed to better advantage to a prospective purchaser. It was conceded that while so engaged petitioner *369 was stricken with a pain in the right groin and suffered a right inguinal hernia. During the early part of February 1957, petitioner's physical discomfort in the region of the inguinal hernia increased so markedly that on February 13, 1957 he was admitted to Orange Memorial Hospital and the aforesaid surgical operation was there performed by Dr. Charles H. Evans, who had operated on petitioner several years previously. Hospital records covering the hospital confinement from February 13 to February 20, 1957, as well as petitioner's prior and subsequent periods of hospitalization, were received in evidence at the formal hearing in the Division and played a prominent part in the proofs considered by the Deputy Director and the County Court.
Appellant did not challenge the fact that the operation for the inguinal hernia was necessary and work-connected, and it was undisputed that, on undertaking the operation, conditions requiring further and more extensive surgery were revealed. Dr. Evans described the operation as follows:
"There was a major inguinal hernia up near the inner inguinal ring. There were three or four hernias known as transversalis hernias. They are acquired hernias through the deep fascia under the major abdominal muscles that come down on each side. There was also an incisional hernia following an operation for gall bladder six or eight years before that."
The surgeon further testified that a routine inguinal hernia operation could be accomplished in "a half hour or three quarters of an hour" but that petitioner's multiple hernial operations required three hours. Petitioner contends and appellant denies that the strain of the protracted operation caused or aggravated a heart condition, hereinafter described, for which he was entitled to be compensated. The differences in the opinions held by the various medical witnesses as to the significance of symptoms and conditions manifested by petitioner during and following the aforesaid operation, as well as on prior and subsequent *370 periods of hospitalization, hereinafter described, bear directly on the issue to be resolved. Petitioner's doctors asserted, and medical witnesses for respondent denied, that petitioner's disabling heart condition was directly due to the effects of the operation. We focus our attention on the proofs revealed by the record.
Concededly petitioner had undergone prior surgery. In his youth he had suffered from spinal meningitis and typhoid fever and at 12 years of age had three eye operations. He had undergone a gall bladder operation in 1942 in New York and Dr. Evans had operated on him for the repair of an inguinal hernia and the resection of "left hydrocele sac" in 1946; on occasions before the February 1957 operation petitioner had complained of "eye fatigue; lack of energy; dyspnea and palpitations." Dr. Evans testified that on the hospital admission statement he had made note of the fact that the "patient has in the past showed some heart damage." That statement, as it appears in the hospital record, is qualified by the insertion of question marks. Dr. Evans further testified, as he had noted in the admission statement, that later electrocardiogram shows "that the heart is essentially normal," and he further stated that there had been eight or nine electrocardiograms taken over the years and that petitioner, "under tension," worried about his health. He emphasized that there was a "suggestion," but "not proven" of previous heart damage and added "* * * I was to check and look out for that. According to the record, in the past, he did have some type of heart malfunction."
During the course of the three-hour operation on February 15, 1957, petitioner suffered a marked lowering of the blood pressure from 130/80 to 90/60. Evidence of lung rales, which were noted on the first post-operative day, considered in connection with petitioner's testimony as to distress in the chest area and arms is the condition with reference to which the oppugnant medical opinions are projected. As hereinafter more specifically outlined, petitioner's *371 doctors ascribed the extensive drop in blood pressure during the operation and the post-operative presence of rales in the right chest as indicative of heart failure due to operational strain, while Dr. Evans felt that they were more logically related to the effects of the anesthesia and were frequently seen in connection with operative procedures and had no relation to heart failure. The hospital record on petitioner's discharge states that the patient had done "exceptionally well following radical repair for hernia * * *. At present * * * heart, lungs, kidneys * * * appeared to be functioning more or less normally." The doctor added that petitioner lived only "two doors away" from him and that he saw petitioner every few days after the latter went home; that he requested "letters from his other physicians, especially as to his so-called heart trouble"; that he considered the "patient's heart good before and after surgery"; that he "wouldn't have sent him home if he had an acute heart."
Dr. Evans had previously testified that during the period of hospitalization in February 1957 he had not felt that petitioner had experienced an "acute heart failure," but it had been "a question for years that he was not a perfectly healthy specimen" and that the witness had postponed the multiple hernial operation for "two years." He stated that he had ordered an electrocardiogram of petitioner prior to the February 1957 operation to make "fairly certain he had a surgically competent heart * * *." He testified that the drop in blood pressure described aforesaid might or might not indicate "some coronary complication"; he stated frankly, on cross-examination, that, although he had had many "experiences with a sudden drop in blood pressure" during operative procedures he did not consider himself as qualified as a "cardiologist or anesthesiologist" to assess the reasons therefor. He added, "We know there are many reasons and many causes." He ascribed evidence on the first post-operative day of rales in the "right chest" and petitioner's complaints, presently asserted, of "dyspnea *372 and cough" during his hospital confinement as "reasonably attributable to his operation or the anesthesia." He responded as follows to a question relating thereto:
"Q. Did the combination of a sudden drop in blood pressure, pain, rales in his chest, necessity for taking cough medicine in the hospital impose a strain or burden upon his cardiovascular system? A. It would in any case to some extent, sir."
Dr. Evans further testified that he had advised petitioner both before and after his operation that "he had to be away from work and stress and strain for three months after radical repair of his massive herniae." He stated that it was possible that he had recommended that petitioner consult a heart specialist.
On March 18, 1957 petitioner consulted Dr. Saul Lieb, a heart specialist who continued thereafter to treat petitioner. An electrocardiogram taken by Dr. Lieb was "essentially normal." Dr. Lieb testified that the reading was substantially similar to that taken by Dr. Albano at the request of Dr. Evans prior to the February 1957 operation. A fluoroscopic examination showed that the "left ventricle of the heart was moderately enlarged and that the aorta was thickened." The doctor testified that the history he received from petitioner included a statement that after the surgery in February 1957 he was "very short of breath and had severe substernal pain, also cough"; that he had to sleep on two pillows. He detailed the results of his physical examination of petitioner and his resultant diagnosis as follows:
"Physical examination showed he was sixty-eight inches in height; he weighed two hundred pounds; temperature 98.6 degrees; pulse 92 per minute; respiration 22 per minute; blood pressure 140 systolic /90 diastolic. A right rectus scar is tender and indurated on abdominal examination.
Examination of the lungs showed a few crackling rales over the left base. Clinical examination of the heart showed the second pulmonic sound to be louder than the second aortic sound; the rate is regular; grade One systolic murmur at the base and apex is present.
*373 Urine analysis was normal; fluoroscopy showed moderate enlargement of the left ventricle is present; the aorta is thickened.
The electrocardiogram showed regular sinus rhythm. There was left axis deviation.
I made a diagnosis at that time of arteriosclerotic heart disease with enlargement of the left ventricle and left ventricular failure. I estimated a permanent disability of 30% of total for this heart condition."
Dr. Lieb prescribed digitalis, put petitioner on a salt free diet and diuretics and saw him at various times during the next few months, to and including July 13, 1957, when petitioner suffered an "attack of acute coronary insufficiency" and was taken to Columbus Hospital where he came under the care of Dr. Michael Ritota, a specialist in internal medicine and cardiology. Following petitioner's release from the hospital on July 20, 1957, Dr. Lieb continued to see him every few weeks. Petitioner was further hospitalized at Clara Maas Hospital for seven days commencing July 26, 1958 and in Beth Israel Hospital for seven days commencing September 5, 1958, but largely because of respiratory pathology and arthritis. These latter hospitalization periods were said by Dr. Lieb to have no significant bearing on the issue here involved.
In response to a hypothetical question which included a recitation of petitioner's earlier operations and the circumstances causing his work-connected hernia and including a statement that, following his operation, petitioner complained of pain in his chest and shortness of breath, Dr. Lieb testified that in his opinion there was a "causal relationship between * * * the heart failure" that he found on his initial examination on March 18, 1957 and the operation petitioner had on February 15, 1957. Amplifying his opinion he said that his review of the hospital records showed that petitioner had no symptoms of heart failure just before the operation; that he developed typical symptoms of heart failure after the operation and that there was a "continuity of symptoms up until" March 18, 1957. He also said that there were "factors" present connected *374 with the operation which "favor the onset of heart failure in this type of individual  the very lengthy operative procedure"; that the treating physician had suspected "some heart damage in the past and some elevation of the cholesterol * * *," which, the witness said, "is consistent with my opinion that there was pre-existing heart disease which was asymptomatic to the patient * * *"; and clues from the hospital records. Specifying those clues he designated the pre-operative normal blood pressure of 130/80; the sharp drop in blood pressure "shortly after the operation," particularly the systolic, the patient's cyanotic condition after the operation; the finding on the first post-operative day of "rales at the base of the right lung" which the witness said was "typical of failure of the left side of the heart"; the fact that the patient was treated "up to the very end with turpenhydrate and codein which is a cough medicine" confirming "pulmonary congestion." He concluded that in his opinion the heart failure he found on March 18, 1957 was "due to a decompensation of a previously compensated heart by the factors involved in the operation which were productive of a large amount of pain, fall in blood pressure and the strain of an operation which was more than the heart could bear" at that particular time. He also testified that in his opinion the attack of coronary insufficiency for which petitioner was hospitalized on July 13, 1957 "resulted in a relapse of the original cardiac condition * * *." He supplemented his earlier testimony by the following:
"Q. Considering the fact that prior to this operation, from electrocardiographic findings and medical observations, there may have been suspicions of an existing cardiographic pathology which was asymptomatic and following this operation it became symptomatic and continued thereafter to be symptomatic, is that fact significant to you? A. Yes, well, I place a great deal of stress on the fact that he was all right, cardiac-wise, except for the suspicions of the treating physician before the operation and directly following the operation he had signs and symptoms of cardiac involvement and there was a continuity of symptoms and exacerbation ever since his operation."
*375 He stated that petitioner's cardiac disability remains at 30% of total and that as one and a half years had passed since the operation he believed the condition was permanent.
Further describing petitioner's condition, Dr. Lieb said that petitioner had "crackling rales at the base * * * indicative of pulmonary congestion. The second pulmonic sound was louder than the second aortic sound, which is indicative of an increase of pressure in * * * the pulmonary circuit"; that in turn is "indicative of increased amount of pressure due to un-nourishment of the lungs and he had a grade One systolic murmur which would go along with an arteriosclerotic heart disease." He felt that the underlying heart condition "probably was in existence for some time" and that the only way he "could come to a decision as to what existed before the operation and after would be based on the facts in the hypothetical question and the hospital records * * * He readily conceded that, on May 16, 1957 when he visited petitioner after the latter had been given digitalis for nearly eight weeks, he noticed improvement; that petitioner then had bronchitis unrelated to the "heart disease" and that some of the shortness of breath he then exhibited was due to the bronchitis; that on July 4 the doctor gave petitioner "an injection of mercuhydrin" because he then showed "a recurrence of cardiac congestion * * * in the lungs." He emphasized that during the whole period petitioner was under treatment for his cardiac condition and that the other conditions described were in addition; that it was petitioner's cardiac condition which prevented him from working.
He explained that as he had no evidence of any electrocardiogram taken at the hospital in February 1957, he could only say that as the electrocardiogram taken by Dr. Albano was essentially normal, as was the one taken by Dr. Lieb, it merely meant that if there were changes during the hospitalization period the condition had become normal; that with reference to persons with arteriosclerosis it is *376 found that from 30% to 60% "do not show changes in the electrocardiograms because the changes are in the coronary vessels with narrowing and hardening and denseness involved in the heart damage  it doesn't show up." He emphasized that one "can have an attack of an acute coronary insufficiency that leaves minor degrees of heart muscle damage and cardiograms will revert toward normal and the electrocardiogram doesn't necessarily have to reflect minor degrees of heart muscle damage."
Dr. Ritota, who was director of the cardiological department in Columbus Hospital, initially saw petitioner there on July 13, 1957 as part of the doctor's regular hospital duty. He testified that petitioner had been admitted because of "blacking-out"; that petitioner had become dizzy and nauseated; that he had been treated for congestive heart failure and had been taking digitalis and also carried nitroglycerin for "pains in the chest"; that he suffered from shortness of breath and had to sleep with his head in an elevated position. The final diagnosis on discharge on July 13, 1957 was "arteriosclerotic heart disease with coronary insufficiency." He treated petitioner while at the hospital and saw him again in August and November 1957 and then examined him on September 5, 1958 at the request of petitioner's attorney.
In response to a hypothetical question, which included the main facts above set forth, the opinion of the witness was sought as to the causal connection between the effects of the February 1957 operation, necessitated by the work-connected hernia, and the petitioner's present condition. He was specifically asked whether the "consequences of that operative procedure * * * had any effect * * * to either cause, aggravate or precipitate a cardiac lesion which may have existed asymptomatic prior to the operation." Answering affirmatively, he stated that "one of the biggest factors in producing the effect today in heart disease, that is the extraneous cause, is probably stress, whether it be physical or mental or any kind of force upon the body." *377 He specifically expressed his opinion in the following summary:
"The underlying and pre-disposing cause is from within or intrinsic and this man twelve years prior had a gall bladder operation and there were stones present and that showed that he had a high cholesterol at that time so that his high cholesterol was the present stress on the arteriosclerosis and rapidifying its growth and progress. Then we come to a series of operations which certainly give further stress and in an individual who had rather a sedentary  rather than one who had a life of walking or muscular activity. As we approach the date of operation we find a man who with all these pre-disposing factors which make him liable to an effect of this type. I can only repeat what Dr. Lieb said, that the length of the operation was certainly a stressful stage and that the patient's anesthesia must have been a tremendous factor at that time and then following the operation the manifestations were obvious whether it was an inflammation of the lungs or congestion. Following the operation, it certainly precipitated a series of events which produced pain and shortness of breath for subsequent months and immediately after the operation. The nearness to which this occurred gives causal relationship effect. The shortness of breath and the pain in the chest are characteristic of both congestive heart failure and coronary artery insufficiency. Coronary artery insufficiency is usually and most always the cause of congestive heart failure. The point in this whole aftermath is that this man now finds himself short of breath at the distance of one block or one flight and it requires three pillows to sleep at night. This is also characteristic of a heart which has a borderline failure in spite of the digitalis medication. * * * On the electrocardiogram it was found  the myocardiogram was in grade Four, that is the ultimate grade you would want to have in heart failure. So that the reserve this man has or had up until the time of surgery must have been very little. It didn't take much stress to throw him from the stage of compensation to decompensation. * * *
Q. Considering the facts, Doctor, he was asymptomatic before and did in fact discharge his full duties in the discharge of his work, what have you to say as to whether or not the disability is causally related to the accident and its sequelae which occurred in this case? A. Well, I think the accident, of course, precipitated the hernia and then the operation had been performed to correct the post-operative  to correct the hernia, and the events that transpired during the operation were stressful and precipitated heart failure and coronary insufficiency. There is relationship."
On cross-examination he emphasized that the finding of heart enlargement and the development of a murmur after *378 the operation were "two cardinal signs of cardiac pathology which go along with congestive failure"; that the "drop in blood pressure during the surgery is an indication of a change in the heart which is inability to take care of the demand at that particular moment"; that rales in the chest "may be due to congestive failure and particularly if the rales are on the right side." He also noted that "rales on the right side may be due to a pneumonitis and that is a fact which may cause congestive failure." He also observed, as significant in support of his opinion, that an increase in respiration was reflected in the hospital record on the second post-operative day, although he recognized that such condition might not be assigned exclusively to heart pathology, that it could be pulmonary. Reasserting his belief that petitioner had arteriosclerosis he emphasized that any "stress condition will aggravate it"; and, testifying specifically with reference to the progressive nature of arteriosclerosis and the effect of the strain of the operation, he said:
"It reached a certain peak in February, at which time an operation was performed on him and then when he had a stress factor upon these arteries which were already cut down in size as far as the openings were concerned, the combination of this particular stage of arteriosclerosis plus the stress of the operation precipitated the heart failure. * * *
Q. Now, do you feel that this disability of 30% of total is attributable solely to the accident of September of 1957 together with the herniorrhaphy or do you feel this 30% of total represents a disability which was caused partially by the trauma and hernia operation and some extrinsic factors? A. I think that the hernia operation was the causative factor in the stress mechanism which caused congestive heart failure and the congestive heart failure is the distinct feature which gives me the estimate of 30% disability here. I am not considering the hernia operation for the pushing of this car, I am considering that this man is in this category of 30% on the basis of a decompensation of the heart."
On behalf of respondent, Dr. Jack S. York, a specialist in internal medicine, testified that he examined petitioner on September 10, 1957 with the resultant diagnosis that *379 petitioner had "generalized arteriosclerosis; arteriosclerotic heart disease with a slightly enlarged heart; and probably coronary sclerosis." Regardless of cause he evaluated the cardiac disability at 15% of total. He testified that the marked drop in petitioner's blood pressure, during the operation on February 15, 1957, and the post-operative "rales in the right base" would not "necessarily" demonstrate heart failure. He ascribed the blood pressure "drop" during the operation to "reflex action on the vascular system." He asserted that rales "existing because of cardiac failure are usually bilateral." He felt if the rales were due to cardiac failure it was "unusual" for the condition to "clear up * * * without definitive therapy." He stressed that it was not unusual following an operation to find rales on one side of the base "due to the collection of mucous which plugs the lower bronchi and gives them a temporary atelectasis."
On cross-examination he conceded that the drop in blood pressure and the presence of rales could indicate cardiac failure; that an operation can be a competent cause of heart failure. He conceded that the absence of any abnormality in the pre-operative electrocardiogram taken by Dr. Albano and in the one taken by Dr. Lieb on March 18, 1957 and the similar absence of an abnormal condition disclosed in the one he personally took on September 10, 1957 did not negative his belief that petitioner suffered from "cardiac embarrassment." Recognizing that ventricular failure is caused by "pre-existing disease" he conceded that it might be adversely influenced by stress and strain of a three-hour operation but reiterated his belief that the hospital record did not support that conclusion.
In view of the aforesaid opinions expressed by Dr. York, who testified as an expert on behalf of appellant, and by Dr. Evans (the operating surgeon and personal physician of petitioner, summoned by appellant by subpoena to testify on its behalf) and the opposing view stated by Dr. Lieb and Dr. Ritota, each of whom treated petitioner, one other item *380 of evidence is important to consider. The record reveals that Dr. Evans wrote a letter dated May 12, 1957 to petitioner's attorney which, to the extent set forth in the appendix, is as follows:
"When Mr. Bisonic was allowed to go home on his fifth post-operative day we were quite sure that he was in good condition and not suffering from any heart or lung damage resulting from his anesthetic or operation, otherwise he would have been held in the hospital for a longer period of time.
We were told that he had developed heart failure soon after his operation must be due to some misunderstanding on Mr. Bisonic's part. [sic] He was told during the first few postoperative days that he had some pulmonary congestion; that he should not be getting out of bed or pulling out his nasal gastric suction tube.
I am sorry that Mr. Bisonic is now suffering from arteriosclerotic heart disease, which is now as found by Dr. Lieb no longer asymptomatic and is now in a more or less decompensated state possibly due to the strain of his recent operation and possibly also the anesthetic."
Dr. Evans frankly acknowledged that the letter was a correct statement of his opinion. Our independent analysis of the evidence in this case has been made to enable us to determine the facts and evaluate them in accordance with the principles enunciated in Russo v. United States Trucking Corp., 26 N.J. 430, 435 (1958). We recognize that in the instant case the admonition in Russo that, because of the opportunity which the Deputy Director has to observe the appearance and demeanor of the witnesses we must give due regard to his advantage in judging their credibility, is tempered by the fact that the Deputy Director who decided this case in the Division did not personally hear the testimony of all of the witnesses. The Deputy, who had heard the testimony of the petitioner and Doctors Lieb and Ritota at an earlier hearing, became ill and another Deputy was substituted. This was done with the full consent of the parties who, on the record stipulated and agreed that the second Deputy might read the transcript of the earlier testimony, hear the other witnesses to be called and decide the case on all of the testimony and exhibits. The latter Deputy *381 heard the testimony, among others, of Dr. York and Dr. Evans and read the transcript as agreed. To the extent applicable we have observed the aforesaid principle and also, as further directed in Russo, supra, 26 N.J., at p. 435, have given full and respectful consideration "of the views expressed, on both fact and law," by the Division and the County Court.
In our review of this case we also recognize that petitioner bears the burden of proof to justify a compensation award and that such award is not sustainable unless the evidence preponderates in favor of the tendered hypothesis, Mergel v. New Jersey Conveyors Corp., 14 N.J. 609, 613 (1954); Ciuba v. Irvington Varnish & Insulator Co., 27 N.J. 127, 138-139 (1958); Augustin v. Bank Bldg. and Equipment Corp., 41 N.J. Super. 187 (Cty. Ct. 1956), affirmed 44 N.J. Super. 242 (App. Div. 1957); that if under the evidence the tendered hypothesis becomes a rational inference based upon the preponderance of probabilities the burden of proof is sustained, Kream v. Public Service Coord. Transport, 24 N.J. 432, 436 (1957); that "the test is probability rather than certainty," Gilligan v. International Paper Co., 24 N.J. 230, 235 (1957).
We have concluded that petitioner has sustained the burden cast upon him. In reaching this conclusion we initially recognize and record the fact that the evidence shows that the operation was undertaken with preliminary tests and with every reasonable justification for believing that, despite petitioner's long medical history, he could and should undergo surgery then deemed imperative. It is also conceded that the operation had to be a complete one and that, once undertaken, the multiple herniae disclosed had to be repaired. Initiation of the surgery was necessitated by the compensable accident.
In assaying the conflict in the view of the respective doctors we have to weigh, as did the two tribunals which earlier considered this case, the testimony of the examining doctor, Dr. York, the operating surgeon, Dr. Evans (not a *382 heart specialist), the evidence given by Dr. Lieb and Dr. Ritota, both heart specialists and both treating physicians, as well as the voluminous hospital records. We determine that the surgery which petitioner underwent was essential in an attempt to cure the hernia resulting from the accidental episode of September 9, 1956, that the operative procedure and its sequelae precipitated a ventricular failure and that the surgery and the cardiac condition are causally related to the aforesaid accident. In reaching this conclusion we have noted that Dr. Evans during his testimony repeatedly emphasized that in his opinion there was no acute heart failure during the operation; that his aforesaid letter to counsel dated May 12, 1957 contained no rejection of the possibility that the decompensated state of petitioner's heart was "due to the strain of his recent operation and possibly also the anesthetic." We feel that, in view of the fact that we are here considering a heart condition, the testimony of the two treating specialists in that field should be given greater weight. Conquy v. New Jersey Power & Light Co., 23 N.J. Super. 325, 330 (App. Div. 1952); Bialko v. H. Baker Milk Co., 38 N.J. Super. 169, 171 (App. Div. 1955), certification denied 20 N.J. 535 (1956). These factors coupled with petitioner's own testimony have persuaded us that petitioner's contentions are supported by the preponderance of the credible evidence.
Neither do we find that the County Court erred as claimed by appellant, either in fixing the amount of the permanent disability award at 25% of total and directing the payment of temporary disability compensation for a period of 26 weeks. Our independent examination of the evidence discloses no reason to lower the amounts of the awards. We hold that they were justified under the evidence.
Appellant finally claims that the County Court and the Division erred in holding that the aforesaid informal award, the then rejection of surgery by petitioner, his agreement to accept an award of 5% of total and the subsequent payment thereof to him bar his recovery in the present *383 proceedings. Not so. N.J.S.A. 34:15-22; cf., Ferraro v. Zurcher, 12 N.J. Super. 231, 235 (App. Div. 1951). The County Court recognized, as do we, the propriety of crediting the amount thereby paid, $825, as against the disability compensation determined to be due.
The judgment of the County Court is in all respects affirmed.
GAULKIN, J.A.D. (dissenting in part).
As my colleagues point out, petitioner's case depended upon proof that, although he had some arteriosclerotic or heart condition prior to the operation, "he was asymtomatic before and did in fact discharge his full duties in the discharge of his work." That was basic in the hypothetical questions asked of petitioner's doctors Lieb and Ritota, in answer to which they expressed the opinion that the operation precipitated petitioner's present disability.
Having given the case the second of the three de novo trials upon the record seemingly allowed by Russo v. United States Trucking Corp., 26 N.J. 430 (1958), it appears to me there are two conspicuous gaps in petitioner's case. The most important is that petitioner produced as his only medical witnesses the experts Dr. Lieb and Dr. Ritota, who never saw petitioner until after the post-operative sequelae allegedly developed, but did not call Dr. Romano, who was his doctor for six years before the operation and was the one who referred him to Dr. Lieb after the operation. Dr. Romano was the one who could best have said whether or not petitioner had been asymptomatic before the operation.
It is disturbing to note in how many workmen's compensation cases the doctor who has treated the patient for years ante litem, and who knows petitioner's prior condition best, does not appear. Inevitably this makes one suspicious.
Although Dr. Evans testified there was no proof of heart damage prior to the operation, the only one who testified that petitioner was asymptomatic then was the petitioner himself, but he limited it to the period following the bladder *384 operation. It is admitted that he had had many electrocardiograms, and had been warned that he probably had "some type of heart malfunction" by several doctors other than those above mentioned (among whom was his cousin), none of whom were called to testify. He admitted telling respondent's Dr. Siegel, before the informal hearing which resulted in the 5% payment, that Dr. Romano was his doctor; and Dr. Siegel's written report, made at that time, said "Heart condition for a number of years. Under the care of Dr. Romano." It was because of the heart condition that petitioner feared an operation.
The second gap is that there was no proof of what petitioner's duties were before the operation, or how active he was, and (except for petitioner's statement that he did) whether he worked steadily. It appears that petitioner may have been a salesman on commission alone, coming and going as he pleased.
Nevertheless, since it appears that respondent had ample time (even during the adjournments of the trial) to obtain Dr. Romano's testimony, and to establish (if it were a fact) that petitioner did not in truth work steadily and asymptomatically prior to the operation, I concur, albeit hesitatingly, with my colleagues in affirming respondent's obligation to pay compensation to petitioner.
However, petitioner's counsel stated early in the hearing before the Deputy, that:
"I might say, so there won't be any mistake as to what we contend, for the cost incurred for the surgery in the Orange Memorial Hospital for this hernia, we concede we are not entitled to reimbursement as the petitioner had chosen to accept this compensation in lieu of surgery which the company would have been willing to have furnished. Under these circumstances, the cases provide he cannot recover for such bills. However, * * * the bills * * * necessarily incurred for treatment of a cardiac condition, that we will claim is the responsibility of the respondent since it declined thereafter to furnish any medical treatment."
Later, counsel repeated that petitioner was making no claim for the bills "* * * that pertain to the surgical *385 intervention done by Dr. Evans for his bill for the surgery and the hospitalization at the Orange Memorial Hospital for that which took care of that surgery * * *."
It seems to me that the quoted statements by petitioner's counsel were a correct statement of the law interpreting R.S. 34:15-15, and that the award should not have included the items which he expressly disclaimed. With that modification, I vote to affirm.