RUTH DWYER, PETITIONER-APPELLANT, v. FORD MOTOR COMPANY, RESPONDENT-RESPONDENT.

Argued October 24, 1961—Decided January 22, 1962.

*Mr. Aaron Gordon* argued the cause for petitioner-appellant (*Mr. Louis L. Cronson,* on the brief; *Messrs. Hirschberg, Nashel, Zorn & Cronson,* attorneys).

*Mr. Verling C. Enteman* argued the cause for respondent-respondent (*Mr. Andrew S. Polito,* of counsel).

The opinion of the court was delivered by

FRANCIS, J. This is a heart death workmen's compensation case. The Division of Workmen's Compensation denied an award; the County Court and the Appellate Division affirmed. We granted certification.

Certification was allowed primarily to review the principle under which benefits are payable in heart attack cases, and the nature of the proof required in such cases to make them compensable.

■ *Ciuba v. Irvington Varnish & Insulator Co.,* 27 *N. J.* 127 (1958), did away with the need for proof that the heart attack was caused or contributed to by an unusual employment effort or strain. That rule was supplanted by the doctrine that if the attack is caused or precipitated or contributed to by the ordinary stress or strain of the employment, a compensable accident comes into being. Thus, when an employee is suffering from an acute, or passively progressive or quiescent, heart condition, and the ordinary routine exertion of his regular work is too much for the heart, irrespective of whether the effort acts alone, or in conjunction or contribution with the weakness induced by the disease, to precipitate or accelerate or aggravate the attack, the resulting disability or death is within the statutory coverage. There is no requirement that the work effort be excessive in the sense of being unusual or not ordinarily engaged in. It is enough that a usual strain associated with the work was of itself too much at that time because of the condition of the heart, or that such routine effort in combination with the diseased condition of the heart produced the collapse. Compensability arises when-

ever the required exertion is too great for the man undertaking the work, whatever the degree of exertion or condition of his heart.

The reasoning process by which the facts in a particular case are evaluated may be further aided by certain inquiries. Did the disabling or fatal attack result *alone* from the inexorable march of the disease? Was it the end result of the degenerative process in connection with which the employment stress was simply a coincidental condition, unrelated in any material way? Has it been shown by evidence, opinion or otherwise, that the exertion attendant upon the duties of employment, no matter how slight or how strenuous, and no matter with what other factors, such as pre-existing disease or predisposition to attack, it may be combined, was sufficient to contribute toward the attack or its aggravation? In short, where the heart has deteriorated to the point that potentially any appreciable degree of exertion carries a danger of precipitating, or so acting upon the condition as to accelerate, a disabling or fatal attack, if the effort or strain, which in fact precipitates or contributes to the attack, occurs during the course of the employment and as an ordinary or usual incident of the work, the resulting disability or death is compensable. Benefits are not lost because the amount of the work stress was such that it might or could be duplicated in routine activity about the home or in customary movements or effort while there. See *Treloar v. Falmouth Docks & Engineering Co., Ltd., A. C.* 481 (1933) ; *26 B. W. C. C.* 214, 222. Nor is compensation to be denied because of proof that even if the accident had not happened the workman would have become totally disabled or would have died within a relatively short time by reason of the progress of his disease. *Woodbury v. Frank B. Arata Fruit Co.*, 64 *Idaho* 227, 130 *P. 2d* 870 *(Sup. Ct.* 1942). As Dean Larson puts it:

"The general idea is that, even if the decedent would probably have died of cancer in any case, the employment is deemed for compensation

purposes the cause of death if, due to a blow hastening the cancer, the employee dies today instead of six months from now." 1 *Workmen's Compensation Law*, § 12.20, *p.* 175.

See also: *Welch v. County of Essex*, 6 *N. J. Super.* 422 (*Cty. Ct.* 1949), affirmed 6 *N. J. Super.* 184 (*App. Div.* 1950); *Milne v. Atlantic Machine Tool Works, Inc.*, 137 *N. J. L.* 583 (*Sup. Ct.* 1948); *Voorhees v. Schoonmaker*, 86 *N. J. L.* 500 (*Sup. Ct.* 1914).

■ It does not follow from what we have written that a heart attack which occurs at work is, without more, compensable. The work connection as a precipitating, aggravating or accelerating factor must appear. The basic idea intended to be conveyed (and which we approve) is expressed in very simple terms in the English case of *Clover, Clayton & Co., Ltd. v. Hughes* (1910) *A. C.* 242, 3 *B. W. C. C.* 275, cited with approval in both *Ciuba, supra,* at *page* 135, and *Hentz v. Janssen Dairy Corp.*, 122 *N. J. L.* 494, 496 (*E. & A.* 1939). There, Lord Loreburn expressed the test in this fashion:

"In other words, did he die from the disease alone or from the disease and employment taken together, looking at it broadly? Looking at it broadly, I say, and free from over nice conjectures: Was it the disease that did it or did the work he was doing help in any material degree?"

■■ Naturally, the *onus* of establishing connection between a heart attack death and the work effort rests on the compensation claimant. The burden has been described in various ways but may be stated concisely in this fashion: Such claimant has the burden of showing by the preponderance of the believable evidence that the ordinary work effort or strain in reasonable probability contributed in some material degree to the precipitation, aggravation or acceleration of the existing heart disease and the death therefrom. In this context, the significance of "some material degree" cannot be stated with mathematical precision. It means an appreciable degree; a degree greater than *de minimis;* it

means that there was some employment exertion capable medically of helping the attack—of furthering its progress. We appreciate the difficulty in formulating a precise legal rule. There has been much discussion and agitation by cardiologists for and against the adoption of minimum medical criteria for use by the expert witness in assessing the probability of causal connection between work effort and heart attacks. But no such uniformly accepted standards have been approved. See *McNiece, Heart Disease and The Law* (Prentice-Hall 1961) *ch.* 17, § 2(c), *p.* 118. And, of course, the courts cannot state in advance whether such criteria would transgress *legal* standards by which they must determine causality. *Id.* 119; & *ch.* 18, § 4, *p.* 132. Moreover, whatever the difficulty may be in the medical profession in reaching common ground as to the test to be applied, the Division of Workmen's Compensation and the judiciary cannot avoid their obligation to administer the compensation law. The Legislature has bestowed the right to monetary benefits for accidental injury arising out of and in the course of employment. And on the judicial scene existence of the right implies coexistence of effective means of enforcing it.

The rule outlined above is not just a catch phrase; it is not simply a formula to be mouthed in making an affirmative assertion of causal connection. The legal conclusion of cause and effect is ordinarily dependent upon evidence of medical causation advanced by physician witnesses in the form of opinion based upon the facts and circumstances attending the heart attack. But we repeat that the *mere* assertion of reasonably probable contributory work connection by a medical witness cannot justify an award. The facts of the situation under examination in their totality must demonstrate causality by the greater weight of the credible evidence. In this area the reasons for the assertion are more important than the assertion itself. *Stanley Co. of America v. Hercules Powder Co.,* 29 *N. J. Super.* 545, 562 (*App. Div.* 1954); reversed on

other grounds 16 *N. J.* 295 (1954). Explanation of the physiological reactions of the diseased or ailing heart to the work strain in terms of sole or contributory cause and effect must generally be regarded as indispensable. The facts and circumstances surrounding the work effort and the heart attack, the medical opinion as to connection between the two, and the explanation of the connection from a medical viewpoint must coalesce in support of a finding by the greater weight of the evidence that the effort was at least contributorily responsible in some material way for the attack.

Some of the language running through the opinions of the various tribunals which have had this cause for consideration gives the impression that proof of a specific incident of work strain or effort coincidental with or immediately preceding the heart attack is regarded as an essential step in the establishment of causality. And the heart specialist whose testimony formed the basis for the denial of compensation said plainly that he would not regard a heart attack as resulting from employment unless there was "a stress or strain incident just prior to the onset of his initial symptom which is usually pain." Proof of such a specific incident is not required as a matter of law, although it cannot be doubted that evidence of work effort closely followed by well recognized symptoms, such as pain, shortness of breath, collapse, etc., points with more probative force to a reasonably probable relation between the two events than if they were separated by a substantial period of time. This is not to say, however, that mere lapse of time between work effort and heart attack compels a conclusion of lack of connection. See *McNiece, supra, ch.* 4, § 2(b), *p.* 14. Solution of the problem depends on the facts of the particular situation considered in the light of the medical opinion adduced for and against the thesis of causal relation. On this aspect of the problem an important consideration must be noted. A *single* instance of work effort is not an essential element in proving causality; a succession of such efforts

over the entire work day is sufficient when followed by the heart attack in such time and under such circumstances thereafter as to demonstrate to the degree of probability required that the totality of work effort contributed to the attack. The right to compensation exists whether a single employment strain or a succession of such strains proved in whole or in material part to be greater exertion than the ailing heart could withstand. The Appellate Division, in *Joy v. Florence Pipe Foundry Co.*, 64 *N. J. Super*. 13, 23 (1960), correctly stated the rule to be:

"Thus, if a strain occurs during the hours of actual employment, but no resulting symptoms are produced until after working hours, the disability, whether in the form of a heart attack * * *, a perforation of an ulcer * * *, or a cerebral hemorrhage, may nonetheless be compensable."

Dean Larson, in his treatise on Workmen's Compensation Law, likewise clearly states the applicable view:

"* * * in Workmen's Compensation the controlling event is something done *to*, not *by* the employee, and since the real question is whether this something was an industrial accident, the origin of the accident is crucial, and the moment of manifestation should be immaterial." 1 *Larson, supra*, § 29.22, *p*. 449. (Emphasis Larson's)

To the author's statement we add only as a cautionary note that the "moment of manifestation" is immaterial so far as the legal principle is concerned; it is not immaterial in the sense of having evidential value in deciding the factual issue of causal relation. Attention may be given here, also, to *Whittle v. E.B.B.W. Vale Steel, Iron & Coal Co.*, 2 *All. E. R.* 1221 (1936), 29 *B. W. C. C.* 179, 198, where Lord Justice Slesser, in considering the matter of time interval between work effort and death, said:

"That seems to me to be entirely a question of fact and of degree. I think if there had been a much longer interval that might have weighed with the learned county judge to say: 'The interval is so long that I do not think in those circumstances I am satisfied that

the strain caused the death.' But there can be no general principle that a man must die immediately he has received the strain; it is a question of fact to be decided on the evidence and the medical evidence."

To the extent that the language of *Loew v. Union Beach,* 56 N. J. Super. 93 (*App. Div.* 1959) and *Jacobs v. Kaplan,* 56 N. J. Super. 157 (*App. Div.* 1959) may be considered contrary to these views, it is disapproved.

 References also appear in the opinions below to the need for proving an event or happening beyond the mere employment itself or for proving an effort greater than the stresses and strains of ordinary living. The import of such tests is somewhat obscure and deceptive. Does "beyond the mere employment" mean something greater than routine effort to which the employee has grown accustomed? Does it indicate a need to prove some employment strain greater than mere passive presence at the place of employment? Does the suggestion that proof must be adduced to show a work effort greater than the ordinary stress and strain of living merely signify a duty to show some employment effort greater than the exertion caused by breathing or moving one's arms, legs or body in the fashion they would move routinely when away from work? Whatever the precise connotation of those expressions, the rule governing compensability may be stated in this fashion: If the effort or strain, whether great or little, was an incident of the employee's work and either alone or in combination with disease played a material part in causing, contributing to or accelerating a heart attack, the attack is compensable.

Since it is not entirely clear whether a test of the proper dimensions was applied in the earlier studies of the case, we feel that justice demands a revaluation of the record in the light of our observations as to the controlling legal rule for determining compensability.

Decedent, Gerald E. Dwyer, age 41, six feet tall, weighing about 200 pounds, was married and the father of four dependent children at the time of his death on April 30, 1958.

He had been in the employ of respondent, Ford Motor Company, for seven years and engaged primarily in factory laboring work. Apparently he was a steady worker and enjoyed good health prior to May 1956.

Around the end of May 1956 he began to experience pain in the chest which spread to his left arm and neck. On June 11, according to his widow, the chest pain became severe, his left arm went "dead" and the hand became "numb and cold." The next day he was admitted to Christ Hospital, Jersey City, where he remained until June 30. The diagnosis on discharge, at which time he was "very much improved," was "arthritis (rheumatoid)" and "angina pectoris." These ailments were listed by the attending physician on the record in the "order of importance," and his final note as to the heart condition was "Patient had typical anginal pains which were promptly relieved with nitroglycerine. E.CGs were negative." It may be noted that these electro-cardiograms were produced and examined at the hearing in the Division by the specialists who testified for the parties. Dr. Saul Lieb, who appeared for petitioner, said they were suggestive of myocardial involvement and would corroborate a diagnosis of coronary disease and coronary insufficiency. Dr. Jerome G. Kaufman, who testified for respondent, did not specifically interpret them while on the stand but after looking at them he did say Dwyer was suffering from coronary sclerosis with insufficiency, known as angina pectoris.

After leaving the hospital, Dwyer remained at home under the care of a cardiologist for three weeks before returning to respondent's plant. His factory work was pursued regularly thereafter. On December 6, 1956, apparently after work, he called at the office of the family physician, Dr. Herman Kaplan, complaining of pain across his chest, radiating down his left arm. Electro-cardiograms were taken but they did not reveal any myocardial damage. The doctor said that if the electro-cardiograms taken in June 1956 at the Christ Hospital did show such damage, in his opinion the

signs of it had disappeared. However, he made a diagnosis of coronary insufficiency and prescribed vasodilator pills.

Dwyer continued to work until February 11, 1957, when Dr. Kaplan made a house visit in response to a call. After this, Dwyer stayed home until February 15. The record is unclear as to just what it was that kept him from employment. The sum of Dr. Kaplan's testimony seems to be that Dwyer was again complaining of chest pains (for which he ordered a continuance of the pills), but that the reason for staying home until February 15 was an upper respiratory infection.

In any event, on February 15, 1957, Dwyer returned to work and engaged constantly in his duties, without further attention by a doctor, for over 14 months until Sunday, April 27, 1958. Shortly before lunch on that day, according to his wife, he had severe pain in his chest and could hardly breathe; perspiration poured from him; there was severe pain in the left arm, and the hand was cold and numb. Mrs. Dwyer called Dr. Kaplan, who prescribed nitroglycerin pills which she obtained from a nearby drug store. These pills were taken at intervals for the remainder of the day. During the night Dwyer had difficulty sleeping and assumed a propped-up, partial sitting position in the bed. Dr. Kaplan came to the house early Monday morning, diagnosed coronary insufficiency and advised continuance of the pills. It is obvious from the testimony that Dwyer had improved considerably. He did not go to work on Monday (his workday began at 3:30 P. M.) but "just stayed at home." Mrs. Dwyer did not say he remained in bed that day and there is no testimony that the severe chest pain, breathing difficulty or left arm and hand difficulty continued that day. Nor does it appear that he slept other than in normal fashion on Monday night.

On Tuesday morning, although he looked pale and fatigued and showed the results of his attack, he felt well enough to want to go to work. The inference is fully justified that he considered he had sufficiently responded to

the medication, as he had on previous occasions, to warrant resuming the employment duties. Mrs. Dwyer called Dr. Kaplan, discussed the matter with him and, although she was not permitted to recite the conversation, it is beyond question that the doctor considered him sufficiently improved to return to work and sanctioned his return. In the doctor's testimony on direct examination, he said he approved the return to the factory but advised against "heavy lifting, heavy pushing, and things like that." On cross-examination, he conceded lack of any independent recollection as to just what advice he gave that morning but said that he had told Dwyer "all along" to do only light work. Nevertheless, with respect to April 29, apparently on the basis of his general knowledge of the case, he said: "Oh, yes, he could go to work."

Dwyer left for work in the afternoon, taking lunch and the nitroglycerin pills along. He drove his car to the plant, an hour's drive, picking up some fellow workers on the way. It must be regarded as unlikely that he could or would have driven for that distance if his left arm were painful and the hand numb or if he had the severe chest pain or difficulty in breathing which he had experienced on Sunday. In fact, one of the fellow workers who rode in the car made no reference in his testimony to any difficulty in operating the car, although he did describe Dwyer as pale, drawn and fatigued looking; and he saw him put a pill in his mouth during the trip.

One of Dwyer's usual duties was to "line up" a barrel filled with a chemical substance on a stand three or four feet above the floor. From that position the barrel when needed would be pushed on to a bonderizing machine to replace the barrel then on the machine, when its contents had been used up. Because of the weight and bulk of the barrel, it had to be lifted by the workman with a steel chain block and fall. The block and fall was attached to the barrel by hooks and the barrel then raised by hand. When raised, it was kept in the hanging position until

needed, then the chain of the block was loosened and the barrel pushed into place. The fellow employee, Hintze, spoken of above, saw Dwyer engage in that operation fairly early in the workday and asserted that when it was finished he looked white, strained, and started to puff, something that he had never done before. The witness added that in fact Dwyer had previously handled the movement with ease. The added portion of the answer was stricken as a voluntary comment. In our view, the striking was improper. It was responsive to the question, and assuming that the intended reason for the action was that the answer represented a conclusion which the witness had not been qualified to give, it must be kept in mind that all conclusions of laymen are not objectionable. There are certain matters of opinion which the ordinary person, by reason of everyday knowledge, experience and judgment is qualified to express. See VII *Wigmore on Evidence* (3d ed. 1940), § 1974, *p.* 113; 1 *Conrad, Modern Trial Evidence* (1956), § 642, *p.* 531. A conclusion based on previous observation that a person handled with ease a physical operation or movement of the type involved here is clearly within the category.

Around 6:30 P. M. Hintze saw Dwyer remove an empty barrel from the bonderizing machine, slacken the chain of the block and fall and push a filled, hanging barrel into place. At this time he looked extra tired, worse than when he had arrived at work; he looked like a "sad sack"; on being asked if he needed water, he said yes. Shortly thereafter he moved a hand truck about 350 feet down an aisle, put a filled barrel on it and pushed it back to his working station. His movements were "a lot slower"; he walked slowly, although he was usually a fast walker. At 7:45, when the lunch break came, he did not eat his lunch or drink his coffee; he took a nitroglycerin pill; he looked as though he could not carry on his usual work.

Part of decedent's work entailed the making of hooks from metal wire. Each one weighed about three-quarters of a pound. When 50 or 60 pounds of them had been made,

they were put in boxes and carried by hand to the point where they were to be used. Dwyer was observed on two occasions that night carrying such boxes. Around 10:30 P. M. he rolled another barrel of chemicals 15 or 20 feet to the bonderizing machine. At this time he looked worse than he had previously.

The work period ended at midnight. Dwyer drove home, taking four fellow workers with him. They were dropped off at intervals along the way. He drove more slowly than usual, and was seen to take a pill during the trip. As he came into the house, it was obvious that he had severe pain. His wife said he was "in awful pain." She immediately called Dr. Kaplan and, being unable to reach him, telephoned the police who took him to the North Hudson Hospital.

On admission to the hospital he complained of severe precordial pains which "started about" three hours prior to admission. Electro-cardiograms were taken and disclosed acute coronary occlusion with posterior wall infarction. Death occurred at 3:20 A. M. April 30, 1958, 50 minutes after admission.

Two specialists in internal medicine testified on the subject of causal connection between the work effort on April 29 and the acute coronary occlusion; one for petitioner and one for respondent. Their testimony reveals agreement on a basic medical principle that stress or strain can be a contributory factor in the aggravation of an existing coronary insufficiency. (See also the testimony of respondent's physician in *Loew v. Union Beach, supra,* at *p.* 103.) Consequently, they approached the question of medical causation from common ground, *i. e.,* effort or strain can contribute to an aggravation or acceleration of an existing coronary insufficiency. Thus, the crucial issue calling for their expert opinion became: *Did* employment strain so contribute? And they recognized that the answer to the question was one of medical fact, that is, it depended on the nature of the particular employment effort or strain to

which Dwyer was subjected and the physiological reactions which followed in its wake.

Dr. Saul Lieb, in answer to a hypothetical question based substantially on the facts outlined above, said that the cumulative effect of the work effort expended on April 29 aggravated or accelerated Dwyer's pre-existing heart condition and resulted in the coronary occlusion. In his opinion, the described work activity was "a major contributing factor" in producing the acute occlusion.

In discussing his conclusion, the doctor said that, starting on Sunday, April 27, and continuing on April 28, Dwyer had suffered a spontaneous worsening of his pre-existing coronary disease, more specifically an attack of acute coronary insufficiency, which continued. There was no indication that he was going to die of it if he had not gone to work on April 29. Such an attack carries with it a certain amount of hazard but, as Dwyer's own previous history indicated, a person can survive many attacks of acute coronary insufficiency. Respondent's physician, Dr. Kaufman, put it this way: some persons die from the first attack, some from the second, and some live "many years."

Dr. Lieb recognized that the acute attack had improved or subsided by the time Dwyer went to work on April 29. There was no indication that the chest pain or shortness of breath persisted as it had on the two previous days, although he showed the effects of the attack. That conclusion Dr. Lieb felt was supported by Dr. Kaplan's permission for Dwyer to return to work. The doctor agreed with Dr. Kaplan that no work requiring physical exertion should have been engaged in; in fact, he opined that Dwyer would have been "well advised" to have remained in bed that day. Such inactivity is advisable because repeated physical exertion puts a greater demand on the heart for blood, and if the patient is suffering from coronary insufficiency the greater demand, if it could not be accommodated, would result in increased coronary insufficiency and eventuate in an acute myocardial infarction. And in this case the repeated work

exertion during the day, as described to him, coupled with the evidence of puffing, physical slowing down as the work progressed, and the worsening of his appearance, provided a "clear indication" that Dwyer's cardiovascular condition kept deteriorating during the work interval, so that he became a "very sick man" by the time he went home. In sum, Dr. Lieb asserted that on the total history the cumulative effect of the repeated exertion (which was inadvisable for a person who had had previous attacks of this type of coronary insufficiency) was such as to increase the extent of his coronary insufficiency so as to be a major contributing factor in producing an acute myocardial infarction.

Dr. Jerome G. Kaufman took the contrary view. On the basis of the history given, he said Dwyer sustained a severe attack of coronary insufficiency on April 27, which persisted thereafter until his death on April 30 which was due to a myocardial infarction resulting from the prolonged attack of insufficiency. In his opinion, there was no causal relationship between the work effort and the death.

In Dr. Kaufman's opinion, Dwyer should have remained in bed after the onset of the attack on April 27. He should not have been working in the throes of his attack because physical exertion of any kind would cause a greater demand on the heart for blood. Under such circumstances he might "lift something and collapse while lifting it and have a rupture of his heart if he had an infarction already existent or this might contribute to a strain incident and I would only have my conscience to bother me * * *." But in this instance he ruled out any causal connection between the obviously substantial work effort and the fatal attack because it is his belief that in order for such connection to exist in any case "there must be a stress or strain incident just prior to the onset of his initial symptom which is usually pain." For purposes of appraising that statement, we must assume that it represents his view as a physician, and not an expression of what he conceives to be the legal test. Even as a medical concept, it poses difficulty for the

judge in the absence of further elucidation. Does "just prior" mean immediately prior? If not, what time interval marks the outermost boundary of acceptable sequence from the medical standpoint? Does the concept mean that no matter how diseased the heart or how great the ordinary work effort may be, medicine does not accept any relation of cause and effect between the effort and a heart attack, if the pain or other relevant symptom does not appear until after the employee reaches home? Moreover, does the reference to "a stress or strain incident" indicate that causal connection will not be considered to exist from a medical standpoint unless the attack follows immediately after a *single* work effort; that if the collapse comes in the train of a succession of work strains, medicine recognizes no causality, in whole or in part?

Apart from these academic medical questions which the judiciary is not qualified to answer, let us look at the testimony of both expert witnesses in the light of the controlling legal test and the facts of the specific case before us, in a search for the greater weight of the evidence as to whether the total employment effort on April 29 in reasonable probability played a material part in the aggravation or acceleration of Dwyer's fatal heart attack. There is no doubt that he had a bad heart or that he had one of a succession of attacks on April 27. The experts agree that bed rest was the required treatment. So commonly known and accepted is that course that judicial notice has been taken of it. *Johnson v. Aetna Casualty & Surety Co.,* 174 *F. Supp.* 308 (*D. Tenn.* 1959); *Prudential Ins. Co. of America v. Gang,* 184 *Tenn.* 188, 197 *S. W. 2d* 806 (*Sup. Ct.* 1946). It is plain also from their statements that heavy work of any kind is dangerous for the patient who suffers from cardiac insufficiency, the degree of danger mounting in mathematical proportion to the extent of the effort, as well as the state of advancement and acuteness of the insufficiency. In all of the following cases involving awards of compensation the workman's heart disease was in an advanced state or in

acute attack when he undertook to engage in regular work exertion. The medical opinion in each was to the effect that rest was the treatment required and physical strain was hazardous. *Central Electric Power Association v. Hicks,* 236 *Miss.* 378, 110 *So.* 2d 351 (*Sup. Ct.* 1959); *Coleman v. Coker,* 204 *Tenn.* 310, 321 *S. W.* 2d 540 (*Sup. Ct.* 1959); *Johnson v. Aetna Casualty & Surety Co., supra; Reynolds Metals Co. v. Robbins,* 231 *Ark.* 230, 328 *S. W.* 2d 489 (*Sup. Ct.* 1959); *Sweat v. United States Fidelity & Guaranty Co., D. C.,* 169 *F. Supp.* 155; *Goodnite v. Farm Equipment Co.,* 234 *Miss.* 342, 103 *So.* 2d 391, 104 *So.* 2d 298, 106 *So.* 2d 383, 683 (*Sup. Ct.* 1958); *Poole v. R. F. Learned & Son,* 234 *Miss.* 362, 103 *So.* 2d 396, 105 *So.* 2d 162 (*Sup. Ct.* 1958); *Cramer v. Sunshine Biscuits, Inc.,* 2 *A. D.* 2d 719, 152 *N. Y. S.* 2d 375 (*App. Div.* 1956); *General Motors Corp. v. Hall,* 93 *Ga. App.* 181, 91 *S. E.* 2d 57 (*Ct. App.* 1956); *Schilling v. Mississippi State Forestry Commission,* 226 *Miss.* 858, 85 *So.* 2d 562 (*Sup. Ct.* 1956); *Thompson-Weinman Co. v. Yancey,* 90 *Ga. App.* 213, 82 *S. E.* 2d 725 (*Ct. App.* 1954); *Lumbermen's Mut. Casualty Co. v. Kitchens,* 81 *Ga. App.* 470, 59 *S. E.* 2d 270 (*Ct. App.* 1950); *Workman v. Johnson Bros. Const. Co.,* 164 *Kan.* 478, 190 *P.* 2d 863 (*Sup. Ct.* 1948); see also *McNiece, supra,* ch. 5, § 3, *p.* 20.

A number of heart attack cases in New Jersey have spoken of a duty on the part of the claimant for compensation to overcome the "presumption" that the disability or death resulted from "natural physiological causes." The expression seems to have appeared for the first time in *Schlegel v. H. Baron & Co.,* 130 *N. J. L.* 611, 612 (*Sup. Ct.* 1943). Experience with workmen's compensation cases over the intervening years has now convinced us that the "presumption" rule has imported an unnecessary and artificial factor into their determination at both trial and appellate levels. The applicable basic and controlling principle, as we have already stated it, is simply that the person seeking statutory benefits has the burden of establishing by the

greater weight of the believable evidence that the heart attack was caused or contributed to in a material way by the employment exertion. Addition of subsidiary or intermediate formulas such as the duty to overcome an antagonistic threshold presumption brings nothing to the inquiry in the way of clarification of the nature of the ultimate burden of proof. Rather, the tendency is to obscure the standard and time-tested rule and to convey the impression that something more than preponderance of the credible evidence is necessary to prove causality. See *Aromando v. Rubin Bros. Drug Sales Co.*, 47 *N. J. Super.* 286, 292 (*App. Div.* 1957); *Dalton v. Consolidated Laundries Corp.*, 134 *N. J. L.* 27 (*Sup. Ct.* 1946). It must be remembered that a presumption of fact of the character of the one under discussion is emptied of all probative force and disappears from the case upon the introduction of any proof to the contrary. Obviously, in a given situation if no evidence of causal connection were offered the burden of proof would not be met and there could be no recovery. To say in such a case that the petitioner has failed to overcome the presumption that the heart attack was due to natural causes, does not contribute either to the clarity or ease of administration of the basic rule. Practical utility being absent, therefore, the presumption must be eliminated as a factor in evaluating the weight of evidence.

The preponderance of the proof in the present record establishes that Dwyer's attack had substantially improved or subsided because of the rest and treatment on April 27 and 28. Certainly he felt himself capable of coping with the work on April 29. Also, his awareness of his own experience with previous attacks and return to work thereafter cannot be overlooked. But, even if he overestimated his capacity to withstand the routine employment strain, compensation is not to be denied if the strain was too much for the weakened heart, *i. e.*, played a material part in aggravating or accelerating the attack. *Cramer v. Sun-*

*shine Biscuits, supra; Larson, supra,* § 38.64(c), *p.* 555; § 38.83, *p.* 566; *McNiece, supra, ch.* 5, § 3, *p.* 20.

The sequence of events while at work is of extreme significance, even utilizing Dr. Kaufman's demand for timely appearance of symptoms of effect on the heart after strain incidents. As has been set forth earlier, within a relatively short time after inception of the workday, Dwyer undertook to put a heavy barrel in position for use by the bonderizing machine. The effect of this effort was unusual. He began to puff, which he had not done before, and he looked strained. This same operation was engaged in about an hour before the lunch period at 7:45. On doing this, he looked extra tired, worse than on arrival at work; like a "sad sack," and acknowledged a need for water. Then, at 7:45, he did not eat or drink; he took a nitroglycerin pill. After further heavy work, such as carrying boxes of hooks weighing 50 or 60 pounds, around 10:30 P. M. he again handled one of the heavy barrels of chemicals. At this time his appearance was worse than previously. These events over the hours involved are fairly indicative of an adverse effect of the physical work strain on the ailing heart and also of a gradual worsening of the heart condition on the heels of the exertions. The reasonableness of these inferences finds some support in the North Hudson Hospital history which reveals that severe precordial pains began around 11:30 P. M., just before Dwyer finished work. Further corroborative significance is also provided by the testimony that by the time he arrived home his pain was so desperate as to require immediate hospitalization for marked coronary insufficiency and acute coronary occlusion. The acuteness and severity of the attack are shown by the failure of four nitroglycerin pills taken in the three hours before admission to give any relief.

Consideration of the entire factual framework in which this decedent's fatal heart attack has been presented stimulates in us a strong feeling of probability that the succession of employment strains described—as distinguished from a

single incident immediately followed by pain or other symptoms—participated in a material way in the acceleration of the attack. We are convinced that the series of exertions so acted on the seriously diseased heart as to join with it to an appreciable extent in hastening the fatal attack. Our emphasis is placed on the total or cumulative effect of the work effort, and not on any single act or any single exertion beyond that usually associated with the work, because of the uncertainty previously mentioned as to the underlying concept on which benefits were denied by the tribunals below.

The circumstance that Dwyer may have gone to work suffering from or weakened by a wholly or partially relieved attack of coronary insufficiency cannot, of itself, be treated as a bar to compensation. For example, in *Johnson v. Aetna Casualty & Surety Co., supra,* the workman's attack began in the morning before he left home to go to work. He had pains in his chest and difficulty in breathing and departed for the place of employment in spite of his wife's protestations. The attack seemed to ease to some extent on the way but began anew, or continued to get worse, as he engaged in his usual tasks which, incidentally, were not as laborious as those of Dwyer in this case. He went to the dispensary because of the pain, remained there about two hours, felt relieved and returned to duty. About four hours later his condition became much worse and he died. The court said: "Any kind of exertion * * * at his work was too much for his heart to withstand in its then grievously impaired condition."

In *Sweat v. United States Fidelity & Guaranty Co., supra,* Sweat began to suffer from difficult breathing and "smothering spells" on returning home from work on Thursday. On Friday, only a half day's work was required. He rested over the week-end but could not report on Monday because of the distress in his chest. On Tuesday, in spite of the continuing breathing difficulty, he returned to work for fear of losing his job. He made no complaints during

the morning of laboring work, but shortly after lunch he suddenly fell from a bench on which he was sitting and died almost immediately. There was substantial medical testimony that the work effort was the primary or contributing cause of the death. Compensation was allowed.

In *Workman v. Johnson Bros. Const. Co., supra,* on the evening before his death the employee came home complaining of severe pain in the chest. His face was pale and his lips blue. The medical witnesses said at the later hearing that he had suffered an occlusion. They said also that he should have been put to bed because very slight activity by a man in that condition is dangerous. He returned to his regular employment as a carpenter the next day and apparently dropped dead at his place of work between three and four o'clock in the afternoon. Compensation was allowed on the basis of medical testimony that driving nails into wood (which decedent had been doing) "could be considered a contributory fact to his sudden collapse"; that it was "entirely probable" that such effort intensified or accelerated his disease so as to cause the death; that probably the work made the "event come on perhaps quicker"; that it was possible that any exertion of any kind at that time "would be the precipitating factor, or the final straw resulting in his death."

In *Poole v. R. F. Learned & Son, supra,* the proof showed the onset of coronary thrombosis on Saturday, while Poole was out hunting. On the Monday following the attack, Poole returned to work, as a "log scaler" (measurer of log footage) and worked all that day. The next day Poole drove in his jeep to a woodsite where he scaled two truckloads of logs and then drove 30 miles to the sawmill and scaled three truckloads. A half hour later, while talking with the mill foreman, Poole suffered a coronary thrombosis attack and died. He had shortly before complained "of a pain in his chest and of a discomfort which had been present since the prior Saturday." The medical testimony was to the effect that he should have been put to

bed on Saturday because all the conditions affecting the circulatory system and heart are aggravated by exertion and physical activity would produce a dangerous complication. Denial of statutory benefits by the attorney-referee, Workmen's Compensation Commission and circuit court, was reversed.

Again, in *General Motors Corp. v. Hall, supra,* the evidence showed that Hall's heart attack began around three o'clock in the morning when he was in bed. He reported for work at 6:45 A. M. and after walking up two flights of steps took his usual place in the assembly line. Very soon thereafter he complained of severe smothering pain in his chest which was radiating into both arms. He told fellow employees that the pain had begun at 3 A. M., but said to one of them that it had "eased off" and to another that it had become intermittent. He was taken home, then to the hospital where he succumbed five days later of coronary thrombosis. The Georgia Court of Appeals said:

"A finding is authorized that the employee, if he had a heart attack at 3, recovered from this attack sufficiently to go on about his daily duties, and that while climbing the steps he suffered another fatal attack."

*Reynolds Metals Co. v. Robbins, supra,* another heart death case, reveals that the attack began prior to the beginning of work which required physical exertion in a room where the temperature was 20 to 30 degrees hotter than outside. Medical testimony was adduced that when the acute attack began, Robbins should have been put to bed immediately, that any exertion would aggravate the condition because the "heart tends to work faster when one is walking or taking physical exercise" because there is "a greater demand on the coronary artery." The testimony showed also that if such a patient is put to bed immediately, he "would have a far better chance of surviving" than if he engages in physical exertion.

512

■ All that we have said projects once again the idea that in administering the Workmen's Compensation Act the law does not consider the state of a workman's heart, *i. e.*, whether sound or far gone in disease, at the time it is subjected to work effort, as a crucial criterion in the determination of his right to benefits for a heart attack. No standard of health is required of an employee and the employer takes him as he is. Whatever the condition of his heart may be at the time of exposure to work strain, if that strain contributes materially to producing or aggravating or accelerating an attack, compensability exists. We recognize the difficulty of applying the rule so as to achieve justice in a given case between employer and employee. Ordinarily the courts must turn to the medical profession for help and guidance. But here we find discord; on the same set of facts one expert finds etiological causation in whole or in part; another denies it. We must assume, from all of the cases appearing in the reports, that even though work effort or strain is accepted medically as a possible aggravating factor, honest differences of opinion may exist within the profession as to whether, under given circumstances, the particular exertion should be considered as having been causally related to a heart attack. The ultimate judicial decision in a specific case, then, must be reached through an evaluation of the conflicting opinions in the light of the facts surrounding the work effort which are relied on by the witnesses as the basis for their views. The delicate nature of that task is the reason why the law must underline so heavily the demand that the medical experts describe the operative factors which have led to their conclusions. As Dean McNiece says: "To the extent * * * that the quality of medical testimony can be improved, the task of courts and commissions in deciding the legal consequences of that testimony will be made easier." *Heart Disease and the Law, supra,* at *page* 132, § 4.

■ For the reasons expressed, our review of the record in the light of the rule of law to be applied satisfies us that

legal causation to the required degree has been shown by a preponderance of the evidence. Accordingly, the judgment is reversed and the matter is remanded to the Workmen's Compensation Division for entry of an appropriate award.

WEINTRAUB, C. J. (concurring). We granted certification in the hope that we could give helpful guidance in this troublesome area. I fear we have not succeeded.

The law is clear enough. The "accident" is the unexpected injury rather than some external event, and hence compensation must be awarded if the work in fact caused or materially aggravated or accelerated disability or death, whether the work effort was ordinary or extraordinary, usual or unusual.

The problem is one of proof. At one time our cases required evidence of unusual stress or strain. That requirement perhaps stemmed from the concept that the "accident" had to be some event other than the unexpected injury. It could, however, have been born of the thought that even though the injury is the accident, yet when one deals with underlying diseases of a progressive nature, an unusual stress or strain should be required simply as a badge of verity, for want of adequate medical criteria to establish or deny a connection between usual effort and the disability or death. At any rate, we rejected the unusual stress or strain doctrine in *Ciuba v. Irvington Varnish & Insulator Co.*, 27 *N. J.* 127 (1958), trusting the medical profession could shed the light needed.

I gather that in heart matters there are conflicting theses within the medical profession as to (1) whether stress or strain *can* precipitate certain disabling injuries or worsen them, and (2) what criteria must be met to establish *medically* a causal connection when it is agreed that stress and strain can be a factor. Hence we do not have the conventional situation in which the basic medical thesis is undisputed, doctors merely disagreeing as to whether on the facts of a case a causal connection is probable. When there are

contending schools of medical opinion as to whether there *can* be a connection between stress or strain and the onset or aggravation of some cardiac injury, a court cannot reach the facts of the particular case unless it first accepts the view that a connection is medically possible, and, of course, to do so necessarily involves a choice between incompatible medical doctrines.

The question then arises, what court should make that choice? One approach is that the highest state court should decide between the contending medical theories and make its choice binding upon all judges, whether they agree or not.

The other approach would be to leave it with each trial judge to make his own selection of a medical thesis. This seems plausible since analytically the issue is factual in nature. Yet this oversimplifies the problem.

For one thing, the fate of the litigants would then depend upon the identity of the judge who happens to hear the case. It would be idle to say that each litigant has a fresh chance to prevail before a given judge, for the judge could hardly accept antithetical theories in successive cases merely on the basis of the relative persuasiveness or credibility of the particular experts who happen to appear. Thus cases would virtually be decided by the very act of assignment for trial.

Still upon that approach, what would be the duty of the county court judge who must decide the case *de novo*? And what would be the issue before the Appellate Division? Should each appellate judge make his own choice of medical doctrine and reverse because it differs with the one the trial judge made? If so, the views of each part of the Appellate Division would then be decisive as to cases which chance to reach it, unless we should accept the existence of disagreements upon medical theory as a basis for certification, in which event our view on that factual question would quite effectively become "law."

And if we are to resolve conflicts of such depth among medical experts, we would have to know much more than

appears in the usual record. Ordinarily the expert states his thesis and goes on from there, without expounding the scientific bases for the doctrine to which he adheres. Moreover, we obtain only the views of the witnesses who happen to testify in the cause. This is hardly a sound way to establish a binding scientific doctrine.

I am not sure the problem I have discussed exists in the present case. The record is not revealing either way.

Mr. Dwyer was in the throes of a disabling episode when he went to work and the issue is whether his work materially aggravated the illness and thus contributed to his death. Both experts agreed that (1) Mr. Dwyer suffered a severe attack of coronary insufficiency on April 27 and the illness continued into April 29, when he returned to work, and (2) Mr. Dwyer should have been in bed, the better to combat the storm. Both further agreed that a prolonged attack of coronary insufficiency could produce the very fatal course which decedent experienced, and, I gather, both agreed that work effort can, but need not necessarily, worsen that illness. Respondent's expert said in effect, as I understand it, that before a medical expert could find work effort did play a baneful role, it must appear that some specific effort was followed by some sign or symptom of injury, for otherwise the witness, however expert, would merely be guessing. Petitioner's expert, on the other hand, believed "the cumulative effect of repeated exertion" was a major contributing factor in the death. In support, he referred to the evidence indicating that during the work day there was a general deterioration of the man's condition. We are not informed, however, as to whether he found anything which *specifically* evidenced a worsening *due to work* rather than to the natural progress of the disease alone.

It may well be that the ultimate opinions of these experts hinged upon doctrinal differences with respect to minimum criteria necessary to show medically that a causal connection existed. Neither witness was interrogated along

those lines. Perhaps if it were developed that the profession is divided upon the subject and there were an extensive discourse upon the contending theories with the scientific support for them, I could make an informed choice. On the present record, I think I must start with the agreed proposition that the work effort could have played a part, and superimposing the day's work upon the grievous illness, I get the feeling that decedent probably became the worse for it. Thus I concur in the result reached by the majority.

But I appreciate regretfully that my reaction to this factual complex can be of no help in another case. It is but a gross reaction rather than a demonstrable product of a step-by-step analysis. When the possibility of causal connection is accepted, we cannot deny relief in all cases simply because science is unable decisively to dissipate the blur between possibility and probability. In such circumstances judges must do the best they can, with the hope their decisions square with the truth, and with a willingness to consider in succeeding cases whatever contribution scientific advances may offer.

This rough basis for decision is not a happy one. A process which leads to an all-or-nothing result in so murky an area is not truly just either to the individual litigants or to the larger interests in the industrial scene. It may well be that until the medical profession can give us dispositive help, some arbitrary compromise would be the more tolerable course. This must be left to the other branches of government which alone can fashion a remedy of that quality.

HANEMAN, J. (dissenting). I find myself in disagreement with my colleagues.

At the outset it might be well to repeat some well established principles.

For an employee to recover workmen's compensation he must prove that he sustained an injury caused "by accident

arising out of and in the course of his employment." *R. S.* 34:15-1.

An injury is caused by an accident when it is the result of an "unlooked for mishap or untoward event which is not expected or designed." It is not essential that a physical injury result from an external force or event. *Spindler v. Universal Chair Corp.,* 11 *N. J.* 34 (1952); *Bollinger v. Wagaraw Bldg. Supply Co.,* 122 *N. J. L.* 512 (*E. & A.* 1939); *Joy v. Florence Pipe Foundry Co.,* 64 *N. J. Super.* 13 (*App. Div.* 1960).

Neither is it subject to dispute that the employer takes an employee as he finds him, *Bober v. Independent Plating Corp.,* 28 *N. J.* 160 (1958); *Wexler v. Lambrecht Foods,* 64 *N. J. Super.* 489 (*App. Div.* 1960); *Martin v. Snuffy's Steak House,* 46 *N. J. Super.* 425 (*App. Div.* 1957), nor that a pre-existing condition aggravated by an employment caused accident is compensable. *Ciuba v. Irvington Varnish & Insulator Co.,* 27 *N. J.* 127 (1958); *Wexler v. Lambrecht Foods, supra; Joy v. Florence Pipe Foundry Co., supra; Bucuk v. Edward A. Zusi Brass Foundry,* 49 *N. J. Super.* 187 (*App. Div.* 1958).

For an employee to recover on a workmen's compensation claim he is not required to prove an employment connected accident to a certainty. It is sufficient if the evidence establishes with reasonable *probability* that the employment caused or proximately contributed to the injury, *i. e.,* here the cardiac episode which caused the employee's death.

In *Ciuba v. Irvington Varnish & Insulator Co., supra,* the court said, at *p.* 139:

"* * * Circumstantial or presumptive evidence, as a basis for deductive reasoning in the determination of civil issues, is defined as 'a mere preponderance of probabilities, and, therefore, a sufficient basis for decision.' *Jackson v. Delaware, L. & W. R. R. Co.,* 111 *N. J. L.* 487 (*E. & A.* 1933). It need not have the attribute of certainty, but it must be a presumption well founded in reason and logic; mere guess or conjecture is not a substitute for legal proof. The determinative inquiry is whether the evidence demonstrates the offered hypothesis as a rational inference, that is to say, a presumption

grounded in a preponderance of the probabilities according to the common experience of mankind. The accepted standard of persuasion is that the determination be probably based on truth. A bare quantitative preponderance is not enough. The evidence must be such in quality as to lead a reasonably cautious mind to the given conclusion. The measure of the weight of the evidence is 'the feeling of probability which it engenders.' *Joseph v. Passaic Hospital Association*, 26 *N. J.* 557 (1958)."

In *Gilbert v. Gilbert Machine Works, Inc.*, 122 *N. J. L.* 533 (*Sup. Ct.* 1939) the court said, at *p.* 538:

"To find from these circumstances that the deceased's demise was the result of an accident arising out of and in the course of his employment is to indulge in pure surmise and conjecture. The law places the burden of proof on the petitioner for compensation; and it is not sustained unless the evidence preponderates in favor of the tendered hypothesis. That must be a rational inference, *i. e.*, based upon a preponderance of the probabilities according to the common experience of mankind. It is required to be a probable or more probable hypothesis with reference to the possibility of the other hypotheses."

It is presumed that "injury or death from heart disease is the result of natural physiological causes, and the *onus* is upon the claimant to prove by a preponderance of the probabilities that the employment was a contributing cause of the injury or death." *Ciuba v. Irvington Varnish & Insulator Co., supra.*

Heart cases as bases for workmen's compensation have long presented a troublesome problem not only in this State but in all of the other jurisdictions as well. The difficulty of establishing a guide in such cases has been experienced in practically every jurisdiction. See *McNiece, Heart Disease and the Law, Chs.* 2, 3 (1961).

In New Jersey, commencing with the landmark case of *Bernstein Furniture Co. v. Kelly*, 114 *N. J. L.* 500 (*Sup. Ct.* 1935), affirmed 115 *N. J. L.* 500 (*E. & A.* 1935), we have run the gamut of theories, from "usual strain" to "unusual strain," and back again to "usual strain." See *McNiece, supra, pp.* 381–387. The result has been a confused and confusing picture which has confounded the mem-

bers of the bench and bar alike. Even since the advent of *Ciuba v. Irvington Varnish & Insulator Co., supra,* which seemed to put the dispute at rest, great doubt appears to exist among practitioners and the judiciary as to the essential proof required for compensation. A casual consideration of the subject demonstrates the reasons for this obfuscated situation and the difficulties encountered in establishing a firm doctrine applicable to every instance of alleged work-connected cardiac failure. These are, in part, (1) the many varieties of "heart disease," (2) the distinction between an original onset of an episode where a perfectly healthy heart had theretofore existed and the aggravation of an existing cardiac or systemic condition which eventuates in a disabling or terminal episode, (3) the uncertainty of the medical profession as to the cause of a cardiac episode in the case of an aggravation, *i. e.,* whether the employment effort of the employee finally triggered the seizure or whether it resulted from the inexorable progress of the disease, (4) the doubt whether cardiac cases in any event are proper subjects for workmen's compensation.

The question with which we are here confronted is one of adjective rather than substantive law—the *quantum* of proof required to establish the occurrence of an accident, as above defined, which resulted in disablement or death. What the majority is doing in the case *sub judice* is establishing a rule of evidence—a yardstick against which all cardiac cases must be measured.

The proof of an accident which involves solely an external force or event presents no particular difficulty. Where, however, recovery is sought, as here, for an alleged accident caused other than by an external force or event, a claimant must establish a causal connection between the performance of his employment duties and the injury. The stress or strain of the duties is, in such instance, substituted for the force or event. Thus the proof is far more difficult in a heart case than in one involving a fractured arm. This difficulty assumes even more importance when it is realized

that the great preponderance of claims in heart cases arises not in instances where a previously healthy person develops a cardiac condition originating in a work-connected incident but rather in cases where a person with an already existing cardiac impairment is disabled or dies, allegedly from the aggravating or triggering effect which his employment duties work upon the diseased organ. See *McNiece, supra, p.* 11. Not too much difficulty is experienced with the determination of the question presented in a claim involving an employment-initiated heart injury but much difficulty does arise in connection with the proof of the causal relationship in an aggravation or triggering case because the latter, by its nature, involves a question of conjunctive causes. It seems beyond dispute that a large segment of our population is affected by cardiac disorders of one form or another. In many there is a good possibility that the employment duties provided only the occasion and not the cause for the episode. See 2 *Stroud & Stroud, Diagnosis & Treatment of Cardiovascular Disease, p.* 1021 (1957), *Levy, Disorders of the Heart & Circulation, pp.* 450–452 (1957). Hence the presumption that disability or death resulting from a cardiac incident is the result of natural physiological causes.

Because of the inexorable progress of arteriosclerotic heart disease, a sufferer will eventually die therefrom, unless he dies of something else in the meantime. A prognosis, where a heart attack is imminent, of whether the final climax will occur within seconds, minutes or days, regardless of what the victim is doing, is impossible to make. Without being able to see the myocardium and thus determine its condition and the condition of the coronary arteries, no physician can predict with any degree of certainty whether a given strain, big or small, or whether no strain at all, will precipitate the final attack in the already diseased heart or whether the terminal event, if and when it occurs, will be primarily due to the progressive nature of the disease. See *Platz, Coronary Heart Disease, ch.* 14 (1957) ; *White, Heart*

*Disease, p.* 555 (1951). Thus the cause is cloaked in uncertainty.

It must be remembered that the compensation claimant bears the burden of proving the happening of an accident by a preponderance of the believable evidence. This has been repeated so often as not to require citation of authority. In a heart case a petitioner, as a basic and fundamental essential for recovery, is ordinarily required first to prove by competent medical testimony that there can be a connection between a given stress or strain and the onset of a cardiac episode. It is only against this backdrop that a layman—used in the sense of one without medical training—can view the specific facts and circumstances of the effort expended by the petitioner to conclude whether an accident occurred. The trier, however, does not reach the position of evaluating the testimony of the petitioner relating to his specific employment duties until he has first determined that it is medically probable for there to exist a causal connection between an employment effort and the particular type cardiac episode involved. Where there are two diametrically opposed respectable and recognized medical doctrines on this subject, it follows that a petitioner to succeed must prove the correctness of the thesis upon which he bottoms his case by a preponderance of the believable evidence. The trial tribunal as well as the appellate tribunal must accept one theory and reject the other for a claimant to succeed. The court, however, is not required to embrace the petitioner's proffered hypothesis unless it is satisfied by a fair preponderance of the believable testimony that his experts state the properly applicable doctrine. A claimant may fail not only because the court rejects his proffered theory and embraces that of a defendant but also because when the testimony of his expert is placed in juxtaposition to that of defendant's, the court cannot conclude that the evidence preponderates in favor of either doctrine.

Initially, then, we are confronted with the problem of adjudging whether a myocardial infarction, which is the

conceded cause of death in the instant case, can be medically caused by physical exertion. There is a divergence of opinion in the medical profession on this point. *Boas, Cardiac Injury Resulting from Effort or Trauma, p. 2* (1955). Without discussing the merits of the two theories we will, for the sake of this argument, say that the evidence preponderates in favor of that school which recognizes that a causal nexus between work effort and myocardial infarction may exist. This on the basis that the two medical experts who testified in this case adhered, apparently, to that view.

Having ventured this first evidential step there is next presented the question whether, under the particular facts, that causal nexus between the specific employment duties of the claimant and the fatal seizure has been sufficiently demonstrated. As in so many cardiac cases, we have here two intellectually honest experts, each professing a contrary opinion as to the probable medical causal relationship.

My brothers caution that the legal conclusion of cause and effect is dependent upon evidence of medical causation, yet in evaluating the testimony of respondent's expert they apparently attribute little credence to his assertion that a specific work effort followed in short order by symptoms of coronary attack represents a proper test of causality. As Doctor Boas in his study above cited states, at *p.* 4:

"Physical strain, if it is to be regarded as the cause of myocardial infarction, must be a specific sudden effort occurring at some particular moment, and it must be followed immediately by symptoms of cardiac disturbance."

Again, at *p.* 7, it is asserted:

"An essential criterion of a cause competent to produce cardiac damage must be that it induced immediate symptoms."

His study also points out at *p.* 2 that acute coronary insufficiency, when it persists for half an hour or longer, results in necrosis of the heart muscle. The infarct thus created, if extensive enough, will produce death. It is for this reason

that caution is indicated in all cases of death by infarct because—

"Occasionally a careful history will reveal that the symptoms of myocardial infarction actually commenced before the man went to work, and were only accentuated and brought to light when he started to work. * * * Under such circumstances the infarction cannot be attributed to a strain occurring at work." *Id.*, at *p.* 7.

Evidence in the instant case indicates that Dwyer suffered an acute attack of coronary insufficiency on Sunday, an attack which, if not in active progress, was still affecting him when he went to work on Tuesday. The probability is very real, then, that the infarct commenced to form as a result of the acute attack of spontaneous nature experienced on Sunday.

It was on this basis that one physician professed his belief that the work effort was not a competent medical causational factor in Dwyer's death. Such a conclusion, viewed in the context of a pre-existing cardiac attack, has responsible medical support. See *Boas, supra, ch.* 9, cases 113, 133.

I do not say that in the light of the contradictory testimony of the other physician that the hypothesis above described is the more likely. I quite frankly confess my inability to evaluate the contradictory testimony of the two recognized cardiological authorities to the end that I can say which medical doctrine has been proven by a preponderance of the believable evidence. This is particularly so in the light of the inability of skilled and nationally recognized authorities to agree either on the medical criteria for establishing causation or whether causation can even exist in the type heart episodes here presented. I cannot say that by the application of deductive reasoning to the two theses here involved, the evidence, evaluated according to the common experience of mankind, preponderates in favor of petitioner's hypothesis. An examination of the reasons and cogency of the respective experts, *Stanley Co. of America v. Hercules Powder Co.*, 29 *N. J. Super.* 545, 562 (*App. Div.* 1954),

reversed on other grounds 16 *N. J.* 295 (1954), to me serves merely to place their doctrines in equipoise. My background, experience and education provide me with insufficient knowledge to intelligently assay their respective theses. In all frankness, this same condition persists in many if not all members of the judiciary. The proof of causal connection between employment duties and a cardiac episode is deficient if, as here, the court is obliged to resort to conjecture, speculation, guess or hunch in order to embrace a medical thesis which makes such connection probable. In *Ligenza v. White Foundry Co., Inc.*, 136 *N. J. L.* 436 (*Sup. Ct.* 1948) affirmed 137 *N. J. L.* 610 (*E. & A.* 1948), the court said, at *pp.* 438–440:

"As previously stated, the medical experts are agreed that all of the foregoing conditions existed at the time the case came to trial. They differ violently on the question of whether the Parkinson's disease, which incidently forms the basis of the greater degree of prosecutor's disability, is causally related to the accident of December 21, 1944. As characterized by the learned court below, 'Petitioner's medical experts say "yes," respondent's say "no." '

\*　　\*　　\*　　\*　　\*　　\*　　\*　　\*

We are thus confronted with a factual question sought to be established by testimony that, to say the least, is highly speculative and conjectural. It is axiomatic that disability suffered in the course of employment, arising from natural causes unrelated to an industrial mishap, is not compensable. To merit that classification, it must be the proximate result of an accident within the statutory sense (*Macko v. Raritan Valley Farms, Inc.*, 131 *N. J. L.* 283; 35 *A.* (2d) 872), or as has been stated, the burden is upon the petitioner to prove that the injury was a result of an accident arising out of and in the course of his employment. This principle is so well established as to require no citation of authority. *Freedman v. Essex Chair Co.*, 135 *N. J. L.* 512; 52 *A.* (2d) 690. An award of compensation cannot rest upon imagination, surmise or conjecture, or upon a choice equally compatible with the evidence. The testimony reveals that prosecutor was unquestionably afflicted with hypertension, arthritis of the spine, an infected oral cavity and a chest infection, as well as arteriosclerosis of an advanced nature. These afflictions may as well be said to have been the competent producing cause of the Parkinson's Syndrome as well as the traumatic injury to prosecutor's spine suffered on December 21, 1944. The court cannot speculate as to which of several causes may have produced the injury complained of by an employee. *Gilbert v. Gilbert Machine Works, Inc.*,

122 *N. J. L.* 533; 6 *A.* (2*d*) 213. It is said, however, that the Parkinson's Syndrome with which prosecutor is now afflicted, was precipitated and aggravated by the injury of December 21st, 1944. Be that as it may, the *onus* still remains upon the injured employee to establish his case by a preponderance of the probabilities according to the experience of mankind. *Jones v. Newark Terminal and Transportation Company*, 128 *N. J. L.* 190; 24 *A.* (2*d*) 564. We have scanned the testimony in vain and are of the opinion that the prosecutor herein has failed to present sufficient evidence to sustain the burden of proof that the Parkinson's disease, from which he suffers, is causally connected with the accident of December 21, 1944."

See *Ames v. Sheffield Farms Co.*, 1 *N. J.* 11 (1948).

I would find, therefore, that the plaintiff has failed to prove the basic essential element of the probability of the happening of an accident by a preponderance of the evidence, and would affirm the Appellate Division.

But aside and apart from the question of adjective law, the conclusion of the majority, in my opinion, works a change in the basic substantive law and expands the Workmen's Compensation Act beyond the limits intended by the Legislature.

I am mindful of the fact that the Workmen's Compensation Act is remedial in nature and should be liberally and broadly construed, *Ciuba v. Irvington Varnish & Insulator Co.*, *supra*; *Spindler v. Universal Chair Corp.*, *supra*; *Bollinger v. Wagaraw Bldg. Supply Co.*, *supra*, and that the purpose of the law is "to shoulder on industry the expense incident to the hazards; to lift from the public the burden to support those incapacitated by industry and to ultimately pass on to the consumers * * * of industry such expense." *Morris v. Hermann Forwarding Co.*, 18 *N. J.* 195, 197, 198 (1955). See also *Renshaw v. U. S. Pipe & Foundry Co.*, 30 *N. J.* 458, 465 (1959). However, employers are not insurers of the lives and health of their employees. The Legislature has not decreed that every injury sustained or every death occurring in employment must be compensated by an employer. *Mergel v. N. J. Conveyors Corp.*, 14 *N. J.* 609 (1954); *Kream v. Public Service Coord. Transport*, 24 *N. J.* 432 (1957). Nor is the policy of liberal construction

a substitute for the proof required to establish a claim. *Bowen v. Olesky,* 20 *N. J.* 520 (1956). Recovery can be had only in those cases arising within the confines of the statute. Sympathy for the workman and his family is no basis upon which to convert the statute into employees' health insurance, a result which I fear the majority opinion accomplishes. Neither is it a substitute for the required proof. We are extending the Workmen's Compensation Law beyond its original limits and intention. Such a result must originate by legislative *fiat* and not by judicial mandate. While the Compensation Act is remedial in its nature, the court should not, by judicial decree, direct compensation contrary to the legislative enactment and intention. *Bowen v. Olesky, supra.*

I realize that my reasoning could result in a denial of recovery in many heart cases. It may well be, on the other hand, that the passage of time and the development of medical knowledge will demonstrate that much undeserved compensation will have been paid under the law as viewed by the majority. See, for example, *Platz, supra,* 341 (case 5).

Additionally, the question of payment of compensation for cardiac disability is of such a nature and so far reaching in its effect as to raise serious doubt as to whether it is a fit subject for workmen's compensation. The problem has been so excellently expressed by Dean McNiece in *Heart Disease and the Law* (1961) that a quotation of his exact language, even though lengthy, rather than a paraphrase, seems justified. He says, at *pp.* 110–111:

"A basic issue which underlies much of the controversy surrounding possible solutions to the cardiac problem is whether cardiac disorders and their effects among the working class truly present a question of industrial injury, or whether in reality, they represent a broad public health problem with only a peripheral relationship to workmen's compensation. Or, to pose the issue somewhat differently, does the cardiac area involve a unique blend of some elements of the typical compensation case and some elements of a broad social phenomenon?

In seeking an answer to this question, one must match heart disease against the traditional principles of compensation law and inquire whether cardiac disability or death should logically be compensated

on an industrial basis. When so viewed, it becomes clear, first of all, that heart disease does not readily fit into one of the traditional molds, the occupational disease. There is no satisfactory proof of which the study is aware that some occupations more than others tend to cause heart disease. For this and other reasons, cardiac claimants, as the report elsewhere demonstrates, have argued, almost without exception, that they sustained an accidental injury rather than an occupational disease. The few successful occupational claims involving cardiacs have usually been cases of heart disease as subsidiary to a recognized occupational disease.

When examined from the other possible compensation viewpoint, that of accidental injury, several features distinguish cardiac incidents from many other species of work-connected casualties. While pre-existing disease is not a rarity in other areas of compensation law, its role is particularly significant in cardiac cases. When permanent disability or death results from a cardiac incident the employer is generally held fully responsible even though the work-connected event would not have caused any damage, or at least very little damage, except for the presence of the pre-existing disease—this on the familiar theory that the employer takes the workman as he finds him. Taking the workman as one finds him is probably the correct approach under existing law and precedent. This does not answer the problem, however. The more basic question is whether existing law is adequate to cope with the problems presented by cardiac disorders.

The role of cardiac disease in the United States is highlighted by the fact that advances in other medical fields have all but eliminated a number of formerly serious diseases. As a consequence, the number of maladies which the average person may contract has been reduced, thereby making it possible for heart disease to afflict persons who, years ago, would have fallen victim to other diseases. The increased longevity of the American population naturally leads to an increase in the number affected by degenerative diseases of all kinds, including cardiac disorders. Moreover, improved diagnosis makes it possible to detect cardiac cases which in earlier years might have remained unknown. These factors, among others, have combined to present the machinery of workmen's compensation with a single disease complex which, from the viewpoint of the population at large, accounts for approximately one out of every two deaths and for a goodly percentage of the disability cases.

The scope of the problem from the standpoint of national health may be gleaned from the following statistics for the year 1957, during which approximately one out of two deaths was caused by arteriosclerosis and hypertension:

CAUSE OF DEATH

| *Arteriosclerosis alone:* | *[Number of persons:]* | |
|---|---|---|
| Arteriosclerotic heart disease (including coronary disease) | 453,840 | |
| General arteriosclerosis | 33,950 | 487,790 |

*Cardiovascular diseases involving*
*arteriosclerosis & hypertension:*

Vascular lesions affecting the central nervous system (primarily cerebral (brain) thrombosis due to arteriosclerosis, cerebral embolism, cerebral homorrhage) ... ... ... .... ... 188,040

Nonrheumatic chronic endocarditis & other myocardial degeneration ............. 61,240 249,280

*Hypertension:*

Hypertension with heart disease (arteriosclerosis) ............. ............ 72,540

Hypertension without mention of heart ..... 11,170 83,710

*Total deaths involving arteriosclerosis* and hypertension .......... ................ 820,780"

And again, at *p.* 112:

"Of course, the quantitative importance for heart disease may not in itself be a sufficient basis for special legal treatment. On the other hand, the staggering fact that *one out of every two workmen* may come to the end of his life or the end of his working days because of this disease suggests that the cardiac problem is one differing in kind, rather than in degree, from others faced by the compensation system. Again, the high incidence of permanent total disability and death cases in the cardiac area is a factor which may serve to distinguish it from other quantitatively important diseases or conditions." (Emphasis supplied)

From a practical viewpoint, it is hardly conceivable that any case will arise where the testimony for the petitioner will not sustain the claim that the work contributed in some material degree to his seizure, especially when it is remembered that, under the law as here enunciated, whenever "the heart has deteriorated to the point that potentially any appreciable degree of exertion carries a danger of precipitating, or so acting upon the condition as to accelerate a fatal attack, if the effort or strain, which in fact precipitates or contributes to the attack, occurs during the course of the employment and as an ordinary or usual incident of the work, the resulting death is compensable." (Emphasis supplied) And *"if the effort or strain, whether great or*

*little,* was an incident of the employee's work and either alone or in combination with disease played a material part in causing, contributing to or accelerating a heart attack, the attack is compensable." (Emphasis supplied) As I read the majority opinion we have now placed our sanction on a medical doctrine favorable to the petitioner. In effect, it changes the test of the accidental nature or causal connection of the work-connected effort with the injury from one of probability to one of possibility. This involves more than a question of semantics. There is a distinct difference in the connotation of these words. The difference in concepts is more than a shade or a degree. An employee may now recover for the fortuitous occurrence of a cardiac episode while at work rather than at home, or even upon returning home, if his condition, though not arising from his employment, was so bad that he should have remained a bed patient rather than to have gone to work in the first instance. Thus he can recover where the employment was the occasion rather than the cause. Every employment requires some effort "whether great or little." Even the bare maintenance of life requires effort by the heart. Thus I am not disposed to say, by the evidence adduced, that the claimant who, before going to work, was already in the throes of the heart seizure which culminated in his death, died as a result of his work effort rather than because of the inexorable progress of the attack. To me it seems indisputable that with the advent of this decision we have engrafted a health insurance feature upon the Compensation Act not only in cardiac but in every disease case.

I am also impressed with the dangers to the workman attendant upon the rule adopted by the majority, broadening the base for recovery. Under this decision both a clerk performing sedentary duties who has an advanced condition of cardiac disease as well as a navvy performing the most physically exhausting labors who has had no prior diseased cardiac history, can recover. Conceivably, recovery may be had for "an effort [no] greater than the stresses and strains

of ordinary living," and for a "mere passive presence at the place of employment." Whether an employer is a self-insurer or is covered by compensation insurance the increase in disability or death payments from cardiac episodes will affect him financially by requiring additional compensation payments or increased insurance premiums. Industry's reaction to the added expense in cardiac cases may well be to minimize that expense by refusing to employ an individual with a known cardiac deficiency and to terminate the employment of an employee who has suffered, whether at home or at work, a cardiac episode. The industrial, economic and sociological impact of such action is fraught with danger, especially when it is noted that "one out of every two workmen may come to the end of his life or to the end of his working days" because of cardiac disease. *McNiece, supra; White, supra,* ch. 23. See also *Levy, supra, pp.* 1–31, 2 *Stroud & Stroud, supra,* at *p.* 1004. The workman who has suffered a cardiac episode even though mild and even though he could still live a useful and productive life, could become totally unemployable. Nor is such a result speculative or remote. It is a presently pressing problem under our existing doctrine of compensation payments for cardiac disability. See Vol. *LXXXIV, N. J. L. J. No.* 50, *p.* 11 (1961) ; *Larson's Workmen's Compensation Law* 567 (1952). The problem may be intensified under the opinion of the majority. The earning capacity of heart diseased employees would then be reduced to the point where it could evaporate. The enforced idleness imposed upon a willing ambitious worker will destroy his income, his dignity and his self-respect while not delaying his terminal episode in the slightest.

I am of the belief that the questions of public policy involved are for the Legislature, whose opportunity by way of public hearing to examine the scientific bases of the doctrinal medical schools of thought as to causation and to evaluate the impact of an extension of compensation is far greater than that of the judiciary. It is for the Legis-

lature to decide whether to extend the Compensation Act, adopt health insurance legislation or to leave matters *in statu quo ante*.

WEINTRAUB, C. J., concurring in result.

*For reversal*—Chief Justice WEINTRAUB, and Justices JACOBS, FRANCIS, PROCTOR, HALL and SCHETTINO—6.

*For affirmance*—Justice HANEMAN—1.